## Alexandria

CALEB DANIEL HUGHES

v.

COMMONWEALTH OF VIRGINIA

No. 1135-91-4

Decided June 22, 1993*

---

* Petition for rehearing granted July 29, 1993.

COUNSEL

Peter D. Greenspun (Gary Moliken; Peter D. Greenspun & Associates, P.C., on briefs), for appellant.

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**BARROW, J.**—This criminal appeal is from a conviction of abduction with intent to defile for which the defendant was sentenced to

fifty years in the penitentiary. The jury's verdict rested upon circumstantial evidence linking the defendant with the unexplained disappearance of a five-year-old child.

We address the sufficiency of the evidence supporting the conviction, the admissibility of certain carpet fibers, the admissibility of statements the defendant made to the police, and the discovery of certain materials that the prosecution failed to provide the defendant. In doing so, we hold that: (1) although evidence supported a finding that the defendant abducted the child, it did not support a finding that he did so with intent to defile her; (2) carpet fibers found in the defendant's car had no probative value because they did not tend to prove or disprove that the child had been in the car; (3) the defendant's statements to the police were admissible because he was not in custody at the time he made them; and (4) certain statements by witnesses to the police were exculpatory and should have been produced by the Commonwealth's attorney. Finally, because our holdings require that we reverse the defendant's conviction and remand the matter for a new trial, we do not consider whether the trial court should have granted a new trial on the grounds of after-discovered evidence and the failure of the Commonwealth to provide *Brady* material.

## CHILD'S DISAPPEARANCE

The five-year-old victim disappeared from a Christmas party held at the clubhouse of an apartment complex. She disappeared at around 10:00 p.m. and is still missing.

She arrived at the party with her mother at approximately 7:15 or 7:30 p.m. Although at its height, approximately 115 people were present at the Christmas party, most of the time only about eighty people were present.

The defendant arrived at the same party at approximately 7:30 p.m. He had recently been hired by the apartment complex as a groundskeeper and attended the party for social reasons.

At one point during the evening, the defendant came to the table where the child's mother and another woman were sitting. During the course of a conversation, the defendant asked the mother about her daughter and how old she was. He also commented that her daughter was pretty. According to the mother, such a comment about the child was not unusual. Although one witness testified that she saw the child sitting on the defendant's lap, no one else said that they saw this, and

the woman sitting with the child's mother said that she did not see the child on the defendant's lap. The defendant also gave the child a cupcake when she asked her mother for a brownie.

At another point during the evening, the child's mother, while taking the child and two small boys to the bathroom, passed the defendant, who was coming out of the men's room. He asked the child's mother if she wanted him to take the children to the bathroom. She said no, and the defendant walked down the hall.

At approximately 10:00 p.m., the child's mother told her daughter that it was time to go. Her daughter asked if she could get some potato chips first, and her mother agreed. The mother saw the defendant near her daughter as she was coming back from the table where the potato chips were located. The mother then turned around to get her coat and to say goodbye to some friends. When she looked up a few minutes later, she did not see the child. She went through the complex looking for the child and could not find her. Instead, she discovered that a full-length window in the utility room was wide open, and she began to scream that her daughter was missing.

One of the mother's friends said that she saw the defendant headed toward the outer door at about 10:00 p.m. or 10:10 p.m., but that she did not see the child with him. An assistant manager of the apartment complex said that she last saw the defendant in the building at approximately 9:50 p.m. She walked through the building at about 10:00 p.m. to start cleaning up and did not see the defendant at that time, even though only about twelve people remained at the party. She also saw the open window in the utility room after the child was discovered missing.

The manager of the complex said that she last saw the defendant at the party at about 9:50 p.m. She also went through the building to start cleaning up and did not see the defendant. A search for the child began after she was discovered missing. The managers of the apartment complex called the police and also tried to contact everyone who had been at the party to see if the child had been seen.

## EVIDENCE OF ABDUCTION

The defendant was among those whom the employees of the complex attempted to reach. The manager of the complex went with another employee to a bar the defendant frequented. He was not at the

bar when they arrived at 10:45 p.m. Another employee called the defendant's home shortly before 11:00 p.m. but was unable to reach him. An assistant manager also called the defendant's home at approximately 11:30 p.m. and again at 12:30 a.m., but was still unable to reach him and spoke only to the defendant's wife.

At approximately 12:30 a.m., a Fairfax County police officer went to the defendant's home. However, he did not see the defendant's car, a maroon Honda, in the area of his home at that time.

Finally, at approximately 1:00 a.m., the defendant called the clubhouse from his home. He spoke with the police officer who was coordinating the search for the child. At first, according to the officer, "he was very agitated, very upset that the police were bothering his wife and why we were calling. He couldn't understand why we were calling his house." The officer explained that a small child was missing from the party and they were attempting to contact everyone who had been at the party to see if they could help in any way in locating the child. The officer described the child to the defendant, and the defendant said that he did not know her and had not spoken to her.

The defendant told the officer that he had left the party about ten minutes after ten and had driven home slowly. When asked if he had stopped on the way home, the defendant said that he had not stopped but had taken the long way home. The distance from the clubhouse to the defendant's home, using the route described by the defendant, was 9.7 miles. After the officer asked him several times why it had taken so long to get home, the defendant finally said that he stopped at a High's Store near his home to buy some beer. When the officer asked what he did for the rest of the time, the defendant did not reply.

The defendant's wife testified that she received the telephone call from the clubhouse at 10:30 p.m. or shortly thereafter. She received another telephone call from a police officer around 11:00 p.m. and a final call from the complex about 12:00 a.m. She became worried and telephoned the defendant's father at 12:15 a.m. She said that the defendant came into the bedroom right after she completed this call, at about 12:20 a.m. The defendant then took a shower and called the apartment complex. The defendant's wife said that she heard the clothes dryer running about this time and that it was making a lot of noise because the defendant's sneakers were in it. She said that it was not unusual for the defendant to do his laundry late at night and that it took about forty minutes for the washing machine to complete a cycle.

A woman who roomed with the defendant and his wife at that time confirmed that the defendant usually washed his clothes late at night. She said that she had heard someone come into the house at around 12:00 a.m. and assumed that it was the defendant. However, she admitted that she really did not know what time the defendant came in.

The clothes worn by the defendant to the party, including his sneakers, were found in the dryer at his home the morning after the party. The clothes were still too damp to wear. In the back seat of the defendant's car, the police found a six-pack of beer which had not been in the car the previous evening when the defendant's wife had driven it.

A police officer testified that the defendant's wife told him that on the night of the child's disappearance her car had been driven fifty-one miles between the time she let the defendant drive it to the party and the time she drove it to work the next morning. She, however, denied telling the officer a specific number of miles and said that she took a "wild guess" that there might have been fifty extra miles on the odometer.

Scientific evidence played a significant role in proving the Commonwealth's case. Hairs and fibers found in the defendant's automobile were compared with hairs and fibers from known sources associated with the missing child. Also, the defendant's sneakers were examined and tested.

One of the human hairs found in the defendant's car exhibited the same microscopic characteristics as fine hairs found on the child's hairbrush. However, the hair could not be positively identified as the child's hair.

Two dyed rabbit hairs found on the passenger's seat of the defendant's car were microscopically consistent with rabbit hair taken from the coat worn by the child's mother to the party and with rabbit hairs found on one of the child's nightshirts. A comparison of the rabbit hairs in the car and those from the mother's rabbit fur coat, using thin layer chromatography, revealed no difference between the dye components used to color the hairs.

Approximately fifty blue acrylic clothing fibers were found on the passenger's seat of the defendant's car. These fibers were microscopically consistent with blue acrylic fibers found on the blazer worn by the child's mother to the party, blue acrylic fibers found on a hairbrush

used by the child and blue acrylic fibers found on one of the child's coats.

The police also obtained a duplicate of the outfit worn by the child on the evening she disappeared — a blue sweater with a Big Bird emblem and a red plaid skirt. The duplicate outfit had been purchased by a person in Kentucky who had ordered the items from the J. C. Penney catalog at about the same time the child's grandmother had ordered the child's outfit from J. C. Penney. The blue fibers found on the passenger's seat of the defendant's car were microscopically consistent with those in the duplicate outfit. In addition, the chemical composition of the fibers found in the car matched that of the fibers taken from the duplicate outfit. An expert testified that, in his opinion, the blue acrylic fibers found on the child's coat, the child's hairbrush, the mother's blazer, and the front seat of the defendant's automobile "could have originated from" a sweater outfit like the duplicate outfit.

Red cotton fibers were also found in the defendant's car. These fibers were microscopically consistent with the red cotton in the skirt of the duplicate outfit.

The defendant's sneakers were cut and gouged along the side of the shoes "by a single bladed tool, such as a knife." Expert opinion was conflicting concerning stains on one of the shoes. One expert said that tests revealed a human serum protein that he believed came from human blood; another expert did not "detect any evidence of blood on the shoes."

■ This evidence must be viewed on appeal in the light most favorable to the Commonwealth and accorded all reasonable inferences to support a criminal conviction. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). The jury's verdict should not be set aside unless it is "plainly wrong" or without evidence to support it. *Id.*

■ Although the evidence in this case is entirely circumstantial, circumstantial evidence alone is sufficient to support a conviction. *Johnson v. Commonwealth*, 2 Va. App. 598, 604-05, 347 S.E.2d 163, 167 (1986). However, it must be examined on appeal with great caution. *Chrisman v. Commonwealth*, 3 Va. App. 371, 377, 349 S.E.2d 899, 903 (1986). All of the necessary circumstances proved must be

consistent with guilt and inconsistent with innocence; they must exclude every reasonable hypothesis of innocence; the chain of these circumstances must be unbroken; and the "circumstances of motive, time, place, means, and conduct must all concur to form an unbroken chain" linking the defendant to the crime beyond a reasonable doubt. *Bishop v. Commonwealth*, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984). All of the circumstances do not have to be proved beyond a reasonable doubt, but the circumstances that are proved must concur in pointing to the defendant's guilt beyond a reasonable doubt. *Stevens v. Commonwealth*, 8 Va. App. 117, 121, 379 S.E.2d 469, 470-71 (1989).

The Commonwealth was required to prove that the defendant "by force, intimidation, or deception, and without legal justification or excuse," seized, took, transported, detained or secreted the missing child with intent to deprive her of her personal liberty or to withhold or conceal her "from any person, authority, or institution lawfully entitled to [her] charge." *Coram v. Commonwealth*, 3 Va. App. 623, 625, 352 S.E.2d 532, 533 (1987). From the evidence in this case, the jury could readily have concluded that the child disappeared from the Christmas party at approximately the same time the defendant left, that the child is still missing, that, even though he lived slightly less than ten miles from the apartment complex, the defendant did not reach home until two and one-half to three hours after he left the party, and that the defendant denied any knowledge of the child. Thus, if the jury also concluded that the child had been in the front seat of the defendant's automobile, it could reasonably have concluded that the defendant had taken the child "by force, intimidation, or deception, and without legal justification or excuse" in order to withhold or conceal the child from her mother.

■ The scientific evidence was, therefore, critical to the jury's determination. Both the commission of a crime and the identity of its perpetrator may be established by scientific evidence. *See, e.g., Spencer v. Commonwealth*, 238 Va. 275, 384 S.E.2d 775 (1989), *cert. denied*, 493 U.S. 1036 (1990). Incriminating evidence was found in the defendant's car: (1) a human hair microscopically the same as those found on the child's hairbrush; (2) two dyed rabbit hairs microscopically consistent with, and containing the same dye components as those on a rabbit hair coat worn by the child's mother and with those found on one of the child's nightshirts; (3) numerous blue acrylic clothing fibers microscopically consistent with blue acrylic

fibers found on the child's coat, her mother's blazer, her hairbrush and an outfit duplicating the one she was wearing when she disappeared; and (4) red cotton fibers microscopically consistent with and matching red fibers in the skirt of the duplicate outfit. The presence of these hairs and fibers permitted the jury to find that the child had been in the front seat of the defendant's automobile. This finding, coupled with the other evidence, permitted the jury to find that the defendant abducted the missing child.

## EVIDENCE OF INTENT TO DEFILE

The defendant was not convicted, however, of simply abducting the child. He was convicted of abducting her with intent to defile. Code § 18.2-48. Therefore, the Commonwealth was required to prove that he abducted her with the specific intent to sexually molest her. *Simms v. Commonwealth*, 2 Va. App. 614, 617, 346 S.E.2d 734, 735 (1986).

 Intent is the "purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case." *David v. Commonwealth*, 2 Va. App. 1, 3, 340 S.E.2d 576, 577 (1986) (quoting *Ridley v. Commonwealth*, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979)). The state of mind of an alleged offender may be shown by his conduct and by his statements. *Long v. Commonwealth*, 8 Va. App. 194, 198, 379 S.E.2d 473, 476 (1989). However, where an offense consists of an act combined with a particular intent, the intent must be established as a matter of fact, and "[s]urmise and speculation as to the existence of the intent are not sufficient." *Dixon v. Commonwealth*, 197 Va. 380, 382, 89 S.E.2d 344, 345 (1955) (sexually suggestive telephone calls made prior to a burglary are insufficient evidence of breaking and entering with intent to commit rape).

 Although intent may be inferred from the facts and circumstances of a particular case, a "natural and rational evidentiary relationship" must always exist "between the fact proven and the ultimate fact presumed." *Morton v. Commonwealth*, 13 Va. App. 6, 9, 408 S.E.2d 583, 585 (1991). If the inferred fact is the only evidence supporting proof of an element of the crime charged, the relationship between the inferred fact and the proven fact must be beyond a reasonable doubt, the required burden of proof. *Id.* at 10, 408 S.E.2d at 585. If, however, other evidence also tends to prove the element of the crime required to be proven, the probative weight of the inferred fact need be no greater than that required of any other evidence admitted

for consideration by the trier of fact, so long as all of the evidence proves the element beyond a reasonable doubt. *Id.*

As evidence of the defendant's intent to sexually molest the child, the Commonwealth points to a conversation the defendant had with another male guest at the Christmas party that night. The defendant remarked that there were "nice looking women" at the party and that he would like to go to bed with them. In addition, in response to the other guest's statement that he was married, the defendant rudely described his lack of sexual fidelity to his own wife. The guest to whom the defendant spoke did not consider the conversation unusual.

■ Sexually suggestive remarks specifically about an intended victim may be sufficient to support an inference that the defendant intended to sexually molest her. *See Stevens*, 8 Va. App. at 119, 379 S.E.2d at 471. However, to infer from the defendant's comments about adult women at the party that he intended to defile the victim is mere speculation. Such speculation on the part of the jury is impermissible. *Dixon*, 197 Va. at 382, 89 S.E.2d at 345.

The Commonwealth attributes special significance to the defendant's actions at the party regarding the child. He spoke to her on several occasions, told her mother that she was pretty, allowed her to sit on his lap, and offered to take her and two small boys to the bathroom. Each of these actions, however, is consistent with an innocent interest in children and desire to be helpful and do not permit an inference of a specific intent to sexually molest a child.

Finally, the Commonwealth relies on the testimony of an expert witness who said that the large number of blue acrylic fibers found on the passenger seat of the defendant's car indicated that the child was not wearing her coat. The Commonwealth contends that this is evidence from which the jury could have concluded that the defendant removed the child's coat and that the purpose for removing it was to sexually molest her. The evidence, however, does not reveal who removed the child's coat or why or when. To allow the jury to infer that the defendant removed it and that he did so with intent to molest her would be to allow them to speculate.

An abduction is punished differently if it is committed with a specific purpose than if it is committed without a specific purpose. *See* Code § 18.2-47 (no specific intent, Class 5 felony); Code § 18.2-48 (intent to extort money, defile or "for the purpose of concubinage or

prostitution," Class 2 felony); Code § 18.2-49.1 (parental abduction, Class 6 felony). The evidence did not establish a motive or purpose for the abduction, nor did it eliminate other possible motives. The child's father, from whom the mother was divorced in May 1987, did not testify, and the only evidence presented concerning him was that he lived elsewhere and could not afford to travel to see the child except when she visited with her grandparents in Arkansas in October 1989. The fact finder could have as easily surmised from this record that the defendant abducted the child to obtain a ransom, to give the child to a childless couple, or to give the child to the estranged father, as it could have surmised that he did so to sexually molest the child. Without direct evidence of intent to sexually molest the child, the Commonwealth had to establish the specific intent by circumstantial evidence; otherwise, the Commonwealth's evidence only establishes a violation of the lesser offense of abduction in violation of Code § 18.2-47. *See McKinley v. Commonwealth*, 217 Va. 1, 3-4, 225 S.E.2d 352, 353 (1976). *See also Patterson v. Commonwealth*, 215 Va. 698, 699, 213 S.E.2d 752, 753 (1975); *Ingram v. Commonwealth*, 192 Va. 794, 801, 66 S.E.2d 846, 849 (1951). This was not done.

In summary, the evidence did not directly prove that the defendant intended to sexually molest the child. The trier of fact could find an intent to sexually molest the child only by resorting to surmise and speculation. Therefore, the evidence was insufficient to support a finding that the defendant intended to defile the child.

## ADMISSIBILITY OF CARPET FIBERS

An almost colorless trilobal carpet fiber found in the defendant's car was determined to be microscopically consistent with a carpet fiber taken from the child's nightshirt. An expert testified that these two fibers "could have originated from the same source." However, no source for either of the two fibers was shown.

A trilobal fiber is a fiber whose cross-section is in the shape of three lobes. The expert explained that such fibers were originally engineered "so they would make carpets to appear to be cleaner. The carpet would be just as dirty . . . but because of the way the light reflects and refracts off of its surface, the carpet would appear to still be clean."

In this case, the expert examined a number of identifiable characteristics of the two fibers and said, "It is possible — I can't put a number

on this, I'm afraid as to any probability, but there is nothing to exclude these two fibers as having had the same origin, as they could both be from the same origin." The expert, on cross-examination, agreed that this particular kind of nylon fiber is "used in virtually every kind of nylon carpet," that "in a given year there may be 700 million pounds" of this nylon fiber manufactured in the United States, and that even more is manufactured worldwide. The defendant objected to the admissibility of these fibers because both were commonly found carpet fibers from undetermined sources.

Evidence must be relevant and material to be admissible. *Johnson v. Commonwealth*, 2 Va. App. 598, 601, 347 S.E.2d 163, 165 (1986). Evidence is material if it tends "to prove a matter which is properly at issue in the case." *Id*. It is relevant if it is probative, that is tends "to establish the proposition for which it is offered." *Id*. Therefore, "[e]very fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue, is admissible." *Epperly v. Commonwealth*, 224 Va. 214, 230, 294 S.E.2d 882, 891 (1982). In addition, evidence that adds "force and strength to other evidence bearing upon" an issue presented is admissible. *McNeir v. Greer-Hale Chinchilla Ranch*, 194 Va. 623, 628, 74 S.E.2d 165, 169 (1953).

Evidence is probative if it can "reasonably show that a fact is sightly more probable than it would appear without that evidence." Edward W. Cleary, *McCormick on Evidence* § 185, at 542 (3d ed. 1984). Whether evidence is probative is often more difficult to determine if the evidence is circumstantial, rather than direct evidence. Direct evidence of a fact in issue is, by definition, probative. Circumstantial evidence, however, is probative only if it allows the trier of fact to infer a fact in issue in the case. Such an inference must be "reasonable"; otherwise the evidence is "too remote." *Boggs v. Commonwealth*, 199 Va. 478, 486, 100 S.E.2d 766, 772 (1957). "Remoteness relates not to the passage of time alone, but to the undermining of reasonable inferences due to the likelihood of supervening factors." Cleary, *supra*, n.8. In summary, circumstantial evidence is probative if one can reasonably infer from that evidence that a fact in issue is "slightly more probable" than it would be without that evidence.

In this case, therefore, the trilobal fiber found in the defendant's car is probative if one can reasonably infer from that fact that it is "slightly more probable" than it would otherwise be that the child had been in the defendant's car. *See id*. at 544. The ultimate inference required

is that the fiber found in the defendant's car came from the child's clothing when she was in his car. If it did not come from the child's clothing while she was in the car, its presence would not be material to this case.

But, first, the jury would have to infer that because a trilobal fiber was on the child's nightshirt, another was on the clothing she wore when abducted. If not, the fiber found in the car could not have come from her clothing. She was not wearing her nightshirt when she was abducted, and no evidence was presented concerning when or where she wore her nightshirt in order to explain how it happened to have the trilobal fiber on it. Had evidence been presented that the carpet in her apartment was made from like fibers, it may have been reasonable to infer that a like fiber was also on her other clothing, but no such evidence was presented. The jury would have had to infer, without the aid of further explanation, that a fiber like the one on her nightshirt was also present on the clothes she wore when abducted.

Next, the jury would have had to infer that the fiber found in the defendant's car came from the child's clothing when she was in his car and not from some other source. Such an inference is permissible only if the jury could reasonably decide that the fiber was more likely to have come from the child's clothing while she was in the car than from the defendant, his wife, or someone else who had been in the car and had previously been in contact with a nylon carpet. No evidence was presented at trial from which the jury could have found that, because of some unique quality of the trilobal fiber or for some other reason, it was slightly more probable that it came from the child's clothing than from some other source. Given the evidence that this type of fiber is "used in virtually every kind of nylon carpet" and that 700 million pounds of the fiber are manufactured in a given year in the United States, it is just as likely that the fiber came from somewhere other than the child's clothing. The fact that the defendant was a maintenance man in the same apartment complex in which the child lived would enhance the likelihood that a carpet fiber would have found its way into his car other than by the child's presence in the car.

In our opinion, the inferences required of the jury were too remote for us to conclude that they were reasonable. The likelihood of too many supervening factors which may have innocently explained the presence of the fiber in the defendant's car prevent us from concluding otherwise. Had a common coin, such as a penny or a nickel, been found on the seat of the car, it would not permit one to reasonably

infer that the child had been in the car, even if a jar or piggy bank full of such coins had been found in her room. Based on the evidence presented at trial, the presence of a trilobal fiber in the defendant's car would have been no more unusual.

The evidence concerning these two trilobal fibers was significantly different from the other hair and fibers admitted into evidence. First, the hair and other fibers found in the car were compared with and found identical to others of known origin: hairs from the child's hairbrush, dyed rabbit hairs from the mother's rabbit hair coat and found on the child's nightshirts, and fibers from an outfit identical to that she wore when she was abducted. It was reasonable for the jury to infer that the child had such hair and fibers on her clothing at the time she was abducted. Second, the hairs and other fibers were of relatively unique origin making it unlikely that their presence resulted from supervening causes. It was reasonable for the jury to infer that they had come from the clothes that the child had on when she was abducted.

The Commonwealth does not contend that the admission of this evidence was harmless error. Furthermore, we need not address whether the error was harmless because, for other reasons, we must reverse the defendant's conviction and remand the matter for a new trial.

## ADMISSIBILITY OF DEFENDANT'S STATEMENTS

On two occasions, the defendant was interviewed by the police and made statements before he was advised of his constitutional privileges against self-incrimination and his right to counsel. The first occasion occurred after the police took the defendant to the police station on the morning after the child had disappeared. The police went to the defendant's home around 5:00 a.m. and, first, talked to him at his home for about fifteen minutes. They showed him a picture of the child and asked if he had ever seen her. He said that he had not. The officers then asked the defendant if he would come with them to "help them out."

The testimony about what took place at this point is conflicting. One of the police officers said that he asked the defendant if he would come with them to the police station to answer some questions. The defendant and his wife both testified that the police officers asked the defendant if he would come with them to search the grounds of the apartment complex because he was probably more familiar with the area than anyone else.

The officers took the defendant instead to the police station. The defendant said that he did not know they were taking him there. He also testified that he would not have gone had he known this.

They arrived at the police station shortly after 6:00 a.m., and the officers questioned the defendant for about an hour. The defendant re-iterated that he had left the party at 10:15 p.m. and described his route home. He also stated that he never saw the child at the party and that he had washed his clothes after arriving home that night. One of the officers continued to question the defendant about the length of time it took for him to reach his home, and finally, accused him of abducting the child. Responding to this accusation, the defendant said, ''Prove it.'' At the end of the interview, one of the officers asked the defen-dant if they could have the clothes he wore to the party. When they returned the defendant to his home about 8:00 a.m., the defendant took the clothes, including his sneakers, out of the dryer and gave them to the officers.

The defendant acknowledged (1) that he did not tell the police he did not want to talk to them, (2) that they did not indicate they were going to arrest him and, (3) that he knew he did not have to tell the police anything if he chose not to. He explained that he talked to them because he did not have anything to hide.

Later that day, after the police had searched the defendant's auto-mobile, they telephoned the defendant and asked him to come back to the police station. The defendant agreed to do so if his wife could come with him and if the police would transport them to the police station because the police had his car. A police officer picked up the defendant and his wife and drove them to the station.

At the station, the defendant took a polygraph examination. The of-ficer performing the examination informed the defendant that he was not under arrest, that he did not have to take the polygraph test, and that he was free to leave at any time. However, the defendant was still not advised of his *Miranda* rights. During the pre-test interview before the polygraph, the defendant asked the officer, ''Did you find any blood on my clothes or in the car; am I guilty yet?'' Also, when asked about the cuts on his sneakers, the defendant responded, ''I don't know what you are talking about. You must have cut the sneakers.''

■ Statements made to a police officer by a person who is "in custody or otherwise deprived of his freedom of action in any significant way" are not admissible into evidence unless he has been advised of his constitutional privileges against self-incrimination and his right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). For this purpose, whether a suspect is in custody depends upon "how a reasonable man in the suspect's position would have understood the situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). A person's voluntary appearance at a police station, where he is immediately advised that he is not under arrest and from which he leaves "without hinderance" [sic] at the end of an interview, indicates that he is not in custody "or otherwise deprived of his freedom of action in any significant way." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). Thus, the conditions surrounding the defendant's return to the police station for the polygraph examination do not indicate any significant deprivation of his freedom of action, and the statements he made at that time were not the result of a custodial interrogation and are admissible.

■ During his earlier appearance at the police station in the morning, the conditions were the same except that the defendant was not expressly advised that he was not under arrest and that he was free to leave. However, the defendant's own state of mind was consistent with his knowledge that he was free to leave, and he did not assert otherwise. Instead, he candidly acknowledged that the police did not indicate that he was going to be arrested, that he knew he did not have to talk to them if he did not want to, and that he talked to them because he had nothing to hide and was willing to cooperate in order to assist in locating the child. A "defendant's subjective belief regarding his freedom to leave" is relevant to determining whether a custodial interrogation has occurred. *United States v. Charles*, 738 F.2d 686, 693 n.7 (5th Cir. 1984). Where the evidence indicates that the defendant was not under arrest and was free to leave and no evidence, including the defendant's testimony, suggests that the defendant thought his freedom of action was limited in any way, we must conclude that he was not in custody and that his statements are, therefore, admissible.

## DISCOVERY

Before trial, the defendant sought and obtained orders requiring the Commonwealth's attorney to produce certain materials for discovery and inspection under Rule 3A:11. In addition, during the trial, the

court ordered the Commonwealth to provide the court with an *in camera* review of any "so-called *Brady* material or discovery items in the event of uncertainty as to whether or not Rule 3A:11 or any order of [the] court requires such statement or evidence to be provided to the defendant."

## A. In Camera Review

The Commonwealth's attorney provided the trial court with copies of various statements from witnesses. After reviewing them, the court did not order their production but ordered that they be sealed and made a part of the record. We have reviewed these statements and conclude that portions of three of them are exculpatory and that a fourth contains statements made by the defendant, which the court had ordered the Commonwealth to produce.

Each of the three exculpatory statements[1] describes the witness' recollection of the child's location immediately before her disappearance. The location they describe is arguably at a time and place some distance from the defendant and inconsistent with the theory that the defendant took her from the building through an open window in the utility room. In addition, the sealed documents include a recitation of statements made by the defendant to Investigator R. Daniele on December 4, 1989, and to Leslie Moore and Lori Keefer on December 13, 1989, that should have been produced in response to the court's order requiring production of all statements made by the defendant to a law enforcement officer or "statements of the defendant within the possession, control or custody of the Commonwealth." These statements, upon remand, should be produced for the defendant's inspection and copying.

## B. Materials Not Produced Until Trial

The defendant contends that the Commonwealth also committed numerous other discovery violations. However, much of the material he complains was not produced before trial was produced as evidence for the Commonwealth at trial. Because we are remanding the case for a new trial for another reason, and because the defendant has now been provided with these materials, we need not address whether the materials should have been produced before trial or if the failure to produce them prejudiced the defendant.

---

[1] These include the statements of Nanette P. Eley, Scott Lewis and Wayne Dellibove.

However, certain material was not produced at trial and may still be undisclosed. Furthermore, the Commonwealth has a continuing duty to disclose additional material previously requested or falling within the scope of the order previously entered. Rule 3A:11(g). Therefore, if the Commonwealth has failed to comply with this rule or with an order issued pursuant to the rule, the court, upon remand, shall order the discovery of the materials not previously disclosed and "grant such other relief as it may deem appropriate." *Id.*

We have previously emphasized that a trial court has a duty to levy sanctions to deter the deliberate failure to comply with discovery. *Stotler v. Commonwealth*, 2 Va. App. 481, 484, 346 S.E.2d 39, 41 (1986). Furthermore, a prosecutor has an ethical duty to make timely disclosure of exculpatory material and cannot avoid disclosure by attempting to determine the material's ultimate materiality. *Humes v. Commonwealth*, 12 Va. App. 1140, 1144 n.2, 408 S.E.2d 553, 555 n.2 (1991) (citing DR 8-102(A)(4)). The failure to carry out these duties reduces "the fact finding process . . . to an exercise in brinkmanship," leaving to an appellate court the difficult burden of having to correct such failure by reversing a criminal conviction otherwise correctly determined. *Stotler*, 2 Va. App. at 484, 346 S.E.2d at 41. For this reason, we have often emphasized the need for trial courts to impose effective sanctions for the failure of prosecutors to comply with discovery requirements. *Humes*, 12 Va. App. at 1143 n.2, 408 S.E.2d at 555 n.2; *Conway v. Commonwealth*, 11 Va. App. 103, 113, 397 S.E.2d 263, 269-70 (1990) (Coleman, J., concurring in part and dissenting in part).

Among the material not completely disclosed before or at trial, and which may still be only partially disclosed, are "lead sheets" concerning reports to the police of alleged sightings of the victim after her disappearance. The failure to disclose the "lead sheets" forms the basis of the defendant's motion for a new trial.

Even though the trial court's order required the Commonwealth to turn over to the defendant all such "lead sheets," the police only turned over 216 of more than 900 such sheets. Among the undisclosed lead sheets was one from a man who said that he saw the child on the Metro in Washington, D.C., in the company of two adults the day after she disappeared. In a later affidavit, he swore that the adults, behaving unusually, held the child across their laps inside a coat and that as they exited from the train, he saw the face of a child beneath the coat, which had fallen open, and that the child under the coat was the child

who had disappeared. He had seen her picture ''in the print and television media on many occasions.'' In explaining why the information had not been given to the defendant, a police investigator said that, in his opinion, the witness, a government employed lawyer, was not reliable because he could not accurately describe the child he saw on the Metro.

Because we are reversing the defendant's conviction and remanding the proceeding for a new trial, we need not address whether the motion for a new trial should have been granted; however, we are required to address the failure to produce the other documents. The court's order required the Commonwealth to produce all of the ''lead sheets'' of alleged sightings of the child after her disappearance. This particular ''lead sheet'' was one of a large number that were not produced as required by the court's order. The refusal to disclose all of the lead sheets as ordered undermines judicial authority. Upon remand, the trial court shall assure compliance with its order to produce.

### C. Failure To Require Discovery

Finally, the defendant contends the trial court erred in refusing to order certain specified materials to be produced for the defendant's inspection. He contends that (1) the Commonwealth should have been ordered to disclose a list of the people who attended the party from which the child disappeared, (2) the Commonwealth should have been required to provide the notes of and the context of statements made by the defendant, and (3) a discovery date should have been ordered.

The Rules of the Supreme Court expressly exclude from discovery statements made by witnesses to police officers. Rule 3A:11(b)(2). The rule contains no provision requiring the Commonwealth to furnish the names and addresses of eyewitnesses to a crime. *Lowe v. Commonwealth*, 218 Va. 670, 679, 239 S.E.2d 112, 118 (1977), *cert. denied*, 435 U.S. 930 (1978). Therefore, the trial court was correct in declining to require the Commonwealth to disclose a list of the people who attended the party.

Unquestionably, the Commonwealth must reveal enough of the context in which a statement by the defendant is made in order that the full meaning of the statement may be understood. The response, ''yes,'' to an inquiry of whether the defendant committed a specific

crime, has meaning that the single word does not have without knowledge of the question or context in which it was made. The court's order required the Commonwealth to disclose "the substance of all statements made . . . by the defendant." This was sufficient to require the Commonwealth to disclose enough of the context of the statement so that its meaning would be understood. The record does not contain the Commonwealth's response to the order; therefore, we are unable to determine whether it complied with the order.

The Rules of the Supreme Court require that a discovery order "specify the time, place and manner of making the discovery and inspection permitted." Thus, the date by which or on which the Commonwealth was required to provide the discovery material should have been included in the order and, upon remand, should be so specified.

In summary, we have concluded that: (1) the evidence supports a finding that the defendant abducted the child but does not support a finding that he did so with intent to defile her; (2) the tan trilobal carpet fiber found in the defendant's car did not tend to prove or disprove that the child had been in the defendant's car and was, therefore, inadmissible; (3) the defendant's statements to the police were made when he was not in custody and were, therefore, admissible into evidence; and (4) exculpatory material and other materials that the trial court ordered to be produced for the defendant's inspection and copying, including those items identified in this opinion, should be produced in accordance with the trial court's order.

The judgment of conviction is reversed and the proceeding is remanded for a new trial.

*Reversed and remanded.*

Benton, J., concurring and dissenting.

## I.

I concur in those parts of the opinion styled "Evidence of Intent to Defile," "Admissibility of Carpet Fibers," and "Discovery." Accordingly, I concur in the decision to remand the case for a new trial.

## II.

I disagree with the majority's assertions in the part of the opinion styled "Evidence of Abduction," that the presence of a hair and various fibers in Hughes' automobile "permitted the jury to find that the child had been in the front seat of [Hughes'] automobile" and that "[t]his finding, coupled with the other evidence, permitted the jury to find [beyond a reasonable doubt] that [Hughes] abducted the missing child." An equally plausible hypothesis exists that explains the presence of the hair and fiber in the automobile.[2]

The evidence in this case proved that for several hours during the Christmas party Hughes was in the same room with the child and her mother. Significantly, for at least thirty minutes, the child, the child's mother, several other adults and Hughes sat together at a table. During that thirty minutes, the child was variously sitting next to her mother, playing with other children, and moving about the room. At one time, the child returned to the table from her playing and asked her mother for a brownie. Hughes, who was sitting at the table and talking to the child's mother and other adults, left the table to obtain a cupcake and gave it to the child. Thus, the evidence proved that Hughes was in close proximity to both the child and her mother at the party.

The evidence also proved that people shed clothing fibers and head hair which can be transferred from one person to other persons with whom there is contact. The presence of a hair and fibers in the automobile did not prove to the exclusion of other hypotheses that the child had been in the automobile. During the first hour and one-half

---

[2] I assume only for the purpose of this discussion that the hair and fibers were sufficiently linked to the child. Examination of the "scientific" evidence demonstrates that it is based upon rather questionable assumptions. The evidence proved that only one piece of hair found in Hughes' wife's car was microscopically consistent with hair found on the child's hairbrush. The evidence further proved that a piece of hair cannot be uniquely matched to any one person. It is not a characteristic like a fingerprint or DNA that can be reliably identified as belonging to one person to the exclusion of a statistically significant number of other human beings having characteristics similar to the child.

The evidence also proved that fibers found among the debris in the automobile were microscopically consistent with fibers found on clothing owned by the mother and the child. The evidence does not prove, however, that these fibers are unique in any way or that they are peculiar to clothing that would not have been owned or worn by Hughes, his wife, his child, or numerous other members of the general population.

Proving only that these items were microscopically consistent with items identified to the child created the opportunity for the jury to speculate about matters which have no foundation in empirical data and whose statistical significance are at best questionable.

that Hughes was at the party, he wore his jacket. The evidence supports the equally plausible hypothesis that it is just as likely that the hair and fibers were shed onto Hughes' jacket at the party and transferred by him onto the interior of the automobile.

### III.

I would also hold that Hughes' first statement to the police was inadmissible. At the suppression hearing, a police investigator, William H. Whildin, testified that at 5:30 a.m. he and another investigator, Wayne Promisel, went to Hughes' residence and talked to him about the child. Whildin said that after a few minutes conversation he "asked [Hughes] if he would come up to the Mount Vernon substation with us, that we wanted to go over everything again and maybe he could help us since he had knowledge of the Woodside Apartment complex." On cross-examination, however, Whildin responded as follows:

Q: What you did was you told him that you would like him to come up and help them — help you all because of this large search that was going on, to go up and to help look for Melissa Brannen, didn't you?

A: No, it wasn't put in those words. *I asked him if he would come up and help us out. It was very vague. I told him that he knew the area, that he did know the complex,* yes, and that we needed to talk to him further.

Q: So when you told him that — when you testified in response to Mr. Horan's questions that you told him that you wanted him to come to the Mount Vernon Station and ask some questions, that's not quite how it went, was it?

A: It is how it went. I wanted to ask him questions. There were lots of questions that I wanted to ask him. (emphasis added).

Investigator Promisel testified on cross-examination at trial as follows:

Q: Investigator Promisel, when you arrived at the house you and Whildin within a couple of minutes asked him to come up to the station you say, right?

A: I would say it was a little bit more than a couple of minutes, but that was eventually what we asked, yes.

Q: .... Isn't that what you really asked him was to go and help with the search since he was familiar with the Woodside Garden Apartments since he worked as a grounds-keeper there?

A: I don't know that it was a formal request, but it was suggested that he might be able to assist, yes.

Q: And he said sure, I'll go help assist, yes.

A: He said that he would go with us, yes.

Q: And then it's at that point on the way up you say let's go up to Mount Vernon and we'll ask you some questions, right, we want to talk to you?

A: Well, he knew that we wanted to talk to him, sir.

Q: Okay, but it's at that point as you're on Route 1 somewhere or getting towards the apartment complex that you say that we're going to go to Mount Vernon to the police station first and we'll talk to you up there?

A: I don't recall that being —

Q: Discussed at all?

A: No, sir.

Q: Okay, so you just went by the apartment complex and went up to Mount Vernon?

A: That's correct, sir.

Both Hughes and his wife testified that Whildin and Promisel asked Hughes if he would help the police search the apartment complex. Hughes testified as follows:

A: They wanted to know if I would go search or help search because I knew the grounds and that kind of thing. I didn't have no problem with that, going out there and helping them search.

Q: Did you know you were going to the Mount Vernon Station?

A: No.

Q: When did you first know you were going to the Mount Vernon District Station?

A: After we passed Woodside Apartments.

Q: Did they say anything to you?

A: Right off, I don't think so, no.

Q: And did they eventually explain why they were taking you to Mount Vernon?

A: Yes.

Q: What did they say?

A: For further questions and going over what we had already discussed.

Q: At any time did they use the words, Mr. Hughes, you are under arrest?

A: No.

Q: Did they ever tell you that you were free to leave? Was that ever part of the discussion?

A: No.

Q: Did they ever tell you that you could stop answering their questions whenever you wanted to?

A: No, they did not.

Hughes' wife was present when the police arrived at her residence. She testified as follows:

Q: And would you describe the conversation at that point. What went on between the investigators and your husband?

A: They explained that they were investigating the disappearance of a little girl at the Christmas party. They wanted to know if he remembered seeing her. Showed him a picture of her, asked if he would come with them to search the grounds and see — he was probably more familiar with the area than anyone else there.

Q: Did they at any point tell him that they wanted to take him in for questioning?

A: No.

Q: Did they at any point tell him in your presence that they were going to take him to the Mount Vernon District Station or the Mount Vernon Police Station for questioning?

A: No.

Q: Was there any conversation about work, what was going to happen with work and him that day?

A: There was some conversation about how tired everyone was at that point and that they would make sure that he got back home and would clear it with his people at work so that he didn't have to stay the whole day. He could come home and get some rest.

Q: How long were the police there from start to finish, about?

A: Fifteen minutes, approximately.

Q: Does that include the time it took for Caleb to get dressed?

A: Yes, yes. It wasn't very long.

Q: And did they at any point leave any impression that they were going to take him in for questioning as opposed to help find the girl?

A: No. They only indicated that this would help her.

On this evidence, the Commonwealth did not discharge its burden of proving that Hughes voluntarily went to the police station. *See United States v. Mendenhall*, 446 U.S. 544, 557 (1980). When the investigators took Hughes out of his residence, past the apartment complex, and to the interrogation at the police station, he was involuntarily taken to a place he had not agreed to go. The evidence proved he was "in custody or otherwise deprived of his freedom of action in [a] significant way." *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). He was interrogated at the station for an hour and one-half. He was not given *Miranda* warnings. He had no automobile, no money, and no means to get home. The circumstances were such that a reasonable person would have concluded that he was not free to leave. *See Mendenhall*, 446 U.S. at 554. I would hold that the statement given during that morning detention was the product of custodial interrogation, was obtained without *Miranda* warnings, and, thus, was not admissible.

For these reasons, I also concur in the reversal and remand for a new trial.

Coleman, J., concurring and dissenting.

I concur in all aspects of Judge Barrow's opinion except the holding that the trial judge erred by admitting the evidence that an "almost colorless" trilobal carpet fiber found in the defendant's car was microscopically the same as another "almost colorless" trilobal carpet fiber taken from the missing child's nightshirt. The fact that a fiber of the same color and configuration as one known to have been found on the victim's nightshirt was also found in the defendant's car where the victim was suspected of having been (and which the other fiber evidence tended to prove) was relevant and, therefore, admissible along with the other circumstantial evidence as tending to prove that the child may have been in the car. Admittedly, the fact that trilobal nylon fiber of this type is common and prevalent in many carpets and that these two fibers were not shown to have originated from the same source diminishes the probative value of such evidence; however, those facts go to the weight that the fact finder is entitled to give the evidence and not its admissibility. "The test establishing relevance [and, therefore, admissibility,] is not whether the proposed evidence conclusively proves a fact, but whether it has *any* tendency to establish a fact at issue." *Wise v. Commonwealth*, 6 Va. App. 178, 188, 367 S.E.2d 197, 203 (1988) (emphasis added).

The majority's holding contravenes the established evidentiary rule that circumstantial evidence should be liberally admitted, despite its slight relevance, if its probative value is not outweighed by its prejudicial effect. *Id.* at 188, 367 S.E.2d at 203; *Cantrell v. Commonwealth*, 7 Va. App. 269, 287, 373 S.E.2d 328, 337 (1988).

> [W]here the proper determination of a fact depends upon circumstantial evidence, the safe, practical rule to follow is that in no case is evidence to be excluded of facts or circumstances connected with the principal transaction, from which an inference can be reasonably drawn as to the truth of a disputed fact.
>
> The modern doctrine in this connection is extremely liberal in the admission of any circumstance which may throw light upon the matter being investigated.

*Widgeon v. Commonwealth*, 142 Va. 658, 664, 128 S.E. 459, 461 (1925); *see also Peoples v. Commonwealth*, 147 Va. 692, 704, 137

S.E. 603, 606 (1927); *Hope v. Commonwealth*, 8 Va. App. 491, 496, 386 S.E.2d 807, 810 (1989), *aff'd en banc*, 10 Va. App. 381, 392 S.E.2d 830 (1990).

The majority concludes that the carpet fiber evidence was not admissible because it is not reasonable to infer from the fact that a common fiber found in the defendant's car was microscopically the same as one known to have been on the victim's nightshirt that the victim had probably been in the defendant's car. The majority states that such an inference is permissible only if the fact finder could reasonably find that the fiber was more likely to have come from the child's clothing while she was in the car than from someone else. The majority, in support of its conclusion, posits that the fiber in the defendant's car could have come from many sources, including other occupants of the vehicle, who could have picked up the fiber from a common source within the complex without the victim ever having been in his vehicle. The majority states that to be admissible, the Commonwealth had to prove that "it was slightly more probable that [the fiber found in the defendant's car] came from the child's clothing than from some other source." In my view, the majority confounds principles of when evidence is admissible to prove a fact with when the facts are sufficient to prove an element of the offense.

Clearly, the fact that such a common fiber was found in the defendant's car and on the child's nightshirt would be insufficient to support a finding of guilt, or even to support the factual conclusion that the child probably had been in the defendant's vehicle. However, the fact that two carpet fibers of the same color and configuration were found on the victim's clothing and in the defendant's car is but one of many circumstances that has some logical tendency, admittedly very slight, which may be considered along with other evidence to prove a fact in issue. *Epperly v. Commonwealth*, 224 Va. 214, 230, 294 S.E.2d 882, 891 (1982) ("Every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue, is admissible"); *see also Cantrell*, 7 Va. App. at 287, 373 S.E.2d at 337. Standing alone, the carpet fiber evidence has very little probative value in proving that the victim had been in the defendant's vehicle, but it is another circumstance consistent with guilt which may ultimately, along with a series of other circumstances that are more than mere coincidence, point unerringly to an accused, and may exclude any reasonable hypothesis of innocence and prove guilt beyond a reasonable doubt.

"[W]hile a single circumstance, standing alone, may appear to be entirely immaterial and irrelevant, it frequently happens that the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion."

*Widgeon*, 142 Va. at 664, 128 S.E. at 461 (quoting *Karnes v. Commonwealth*, 125 Va. 758, 764, 99 S.E. 562, 564 (1919)); *see also Peoples*, 147 Va. at 704, 137 S.E. at 606; *Hope*, 8 Va. App. at 496, 386 S.E.2d at 810.

In my opinion, the trial court did not err by admitting the carpet fiber evidence, even though its probative value was minimal. Accordingly, I would reverse and remand for a new trial, but on remand, I would permit the introduction of the carpet fiber evidence.