**Richmond**

CALEB DANIEL HUGHES

v.

COMMONWEALTH OF VIRGINIA

No. 1135-91-4

Decided June 21, 1994

COUNSEL

Peter D. Greenspun (Gary Moliken; Peter D. Greenspun & Associates, P.C., on brief), for appellant.

Eugene Murphy, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on briefs), for appellee.

## UPON A REHEARING EN BANC

OPINION

MOON, C.J.—Caleb Daniel Hughes was convicted of the abduction with the intent to defile of a five-year-old female child who disappeared from a Christmas party in 1989 and has never been found. We granted a rehearing *en banc* from a panel decision holding that the evidence was sufficient to prove abduction but insufficient to prove the intent to defile. *Hughes v. Commonwealth*, 16 Va. App. 576, 431 S.E.2d 906 (1993). On rehearing, Hughes contends: (1) the evidence was insufficient to support a finding that he abducted the child with the intent to defile her; (2) the trial court erred in admitting evidence that clothing fibers found in the appellant's car were similar to fibers in the child's clothing and her mother's clothing; (3) the trial court erred in admitting fibers found in the carpet of the appellant's car that were similar to fibers in the child's home; (4) the trial court erred in admitting Hughes's pre-arrest statements to the police; (5) the Commonwealth failed to comply with a discovery order to turn over to Hughes certain exculpatory statements made by witnesses to the police; and (6) the trial court erred in refusing to grant a new trial based upon after-discovered evidence.

We find that the clothing fiber evidence and the statements made by the appellant to police were admissible for the reasons set forth in the panel's decision. *Hughes*, 16 Va. App. at 590-92, 431 S.E.2d at 914-15. We find that the carpet fiber evidence, which the panel majority held to be inadmissible, was admissible for the reasons set forth in Judge Coleman's concurring and dissenting opinion. *Id.* at 602-04, 431 S.E.2d at 921-23. For the reasons stated in the panel's majority opinion, we hold that the evidence was sufficient to prove that the appellant abducted the female child victim. *See id.* at 585, 431 S.E.2d at 910-12. How-

ever, contrary to the panel's majority opinion, we hold that the evidence was sufficient to prove that appellant abducted the female child with the intent to defile her.

We further hold that the *Brady*[1] material that the Commonwealth failed to produce before trial probably would not have brought about a different trial result had it been produced and that the purportedly newly discovered evidence likewise probably would not have produced a different trial result. For these reasons, we affirm the judgment of the trial court.

## I. FACTS

The five-year-old victim, who was shy and afraid of strangers, arrived with her mother at a Christmas party in their apartment complex club room on a bitterly cold evening between 7:15 and 7:30 p.m. on December 3, 1989. As many as 115 people may have attended the party at various times. The child disappeared at about 10:00 p.m. and remains missing to this day.

The appellant arrived at the same party at about 7:30 p.m. He had been working at the apartment complex for several weeks as a groundskeeper. He had no work duties at the party but was invited by the apartment complex assistant manager.

The child's mother first noticed appellant when she was sitting at a table and saw him staring at her. She had never previously met appellant. Later that evening, the appellant came to the table where the child, her mother, and another woman were sitting. He stayed about thirty minutes. During the stay, the appellant asked the mother whether the child was her daughter, if she was an only child, and how old she was. He also commented that her daughter was pretty. One witness stated that appellant had the child on his lap. When the child asked her mother for a brownie, the appellant went to the bar and brought a cupcake back to her. While the child was playing nearby, she came back to the table a "couple of times" and appellant spoke to her each time.

During the evening, the child played with three other children in a corridor adjacent to the main party room. The corridor contained doors to a coat room, the women's and men's restrooms, and a door to the utility room. Later in the evening, the child's

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

mother took the child and two small boys to the bathroom. The appellant, who was coming out of the men's room, asked the child's mother if she wanted him to take the children to the bathroom for her. The mother refused the offer.

Except when he was at the table where the child and her mother were seated, appellant stood at the bar nearly the entire evening. At one point, appellant told the apartment complex manager, Lori Keefer, and resident manager, Leslie Moore, that he was "going to get real drunk." When Keefer asked appellant to run an errand during the party, he replied, "I'm not going unless you go." Appellant also remarked to another male guest, whom he had just met, that there were "nice looking women" at the party and that he would "like to go to bed with them." Appellant also boasted of his marital infidelity, stating, "what she doesn't know won't hurt her." He also asked a woman whom he had just met to go dancing with him that evening. The woman declined the offer.

At about 10:00 p.m., the child's mother told her that it was time to leave the party. The child went to the coat rack and put on her jacket. She then asked her mother whether the child could get some potato chips before leaving, and her mother agreed. The mother watched her daughter go toward the table where the potato chips were located. She saw appellant approach and speak to the child, but the child ignored him. The appellant continued walking down the ramp which led from the party room to the exit doors. The mother saw the child pick up the chips, put them on a plate, and start back up the ramp toward her mother. When the child was half way across the room, the mother and the child smiled at each other. The mother then saw appellant kneel down on the ramp as the child walked by. The child kept walking past appellant, so appellant stood and walked back down the ramp toward the bar. The mother then turned to get her coat and to say goodbye to her friends. They exchanged a few words, and when the mother looked up, she saw neither the child nor appellant. She first looked for the child in both the women's and men's bathrooms but could not find her. She then discovered the door to the utility room was unlocked. She looked in the room and discovered that a full-length window, which had been closed earlier that evening, was cranked wide open. The window was large enough that someone could have stepped through it onto the ground outside. The mother then began to scream that her daughter was missing,

and a search for the child began.

The managers of the apartment complex called the police and also tried to contact everyone who had been at the party to determine whether anyone had seen the child. Other apartment complex employees tried to reach appellant several times during the following two and one-half to three hours. A police officer called the appellant's home shortly before 11:00 p.m., and an assistant manager also called the appellant's home at about 10:30 p.m., 11:00 p.m., and again at 12:30 a.m. Neither caller was able to reach him; both spoke only to the appellant's wife.

At about 12:30 a.m., a Fairfax County police officer went to the appellant's home. The officer did not see the appellant's car, a maroon Honda, at the time.

The appellant's wife testified that appellant came into their bedroom at approximately 12:20 a.m. She was "very upset" and told him of the numerous inquiries as to his whereabouts. Instead of returning the telephone calls to the police and apartment manager immediately, appellant first took a shower. The appellant's wife said that she heard the clothes dryer running about this time and that it was making a lot of noise because the appellant's sneakers were in it. She said that it was not unusual for the appellant to do his laundry late at night.

At about 1:00 a.m., the appellant called the clubhouse from his home. Appellant spoke with the police officer who was coordinating the search for the child. At first, according to the officer, "he [appellant] was very agitated, very upset that the police were bothering his wife and why we were calling. He couldn't understand why we were calling his house." The officer explained that a small child who had attended the party was missing and they were attempting to contact everyone who had been at the party to see if anyone could help in any way to locate the child. The officer described the child to the appellant. The appellant said that he did not know the child and had not spoken to her.

The appellant told the officer that he had left the party about ten minutes after ten o'clock and had slowly driven home. When asked if he had stopped on the way home, the appellant said that he had not stopped but had taken the long way home. The distance from the clubhouse to the appellant's home, using the route

described by the appellant, was ·9.7 miles. A police officer testified that the appellant's wife told him that her car had been driven fifty-one miles between the time she let her husband drive it to the party and the time when she drove it to work the next morning. After the officer asked appellant several times why it had taken him so long to get home, the appellant finally said that he stopped at High's convenience store near his home to buy some beer. When the officer asked what he did for the rest of the time, the appellant did not reply.

The following morning, the police went to appellant's home and found the clothes he wore the previous evening to the party, along with his sneakers, in his dryer. The sneakers were examined and tested. Police found the sneakers cut and gouged along the side of the shoes "by a single blade tool, such as a knife." Although the expert's opinions were conflicting concerning stains on one of the shoes, one expert said that tests revealed that the stains were a human serum protein that he believed came from human blood.

The following morning, appellant's wife drove to work the car that he had used the previous night. The police went to her workplace and received permission to take her car in order to examine it. The police searched the automobile, where they found human hairs, carpet fibers, and clothing fibers. The hair and fibers were similar to hair and carpet fiber found at the child's home. The clothing fibers were similar to fibers found in clothing identified as being like the clothing the child had worn the night she disappeared. In the back seat of the appellant's car, the police found a six-pack of beer which had not been in the car the previous evening when the appellant's wife had driven it.

Later that day, the police telephoned the appellant and asked him to come to the police station. The appellant agreed to do so if his wife could come with him and if the police would transport them to the police station because the police had his car. A police officer picked up the appellant and his wife and drove them to the station.

At the station, the appellant took a polygraph examination. The officer performing the examination informed the appellant that he was not under arrest, that he did not have to take the polygraph test, and that he was free to leave at any time. Accordingly, the appellant was not advised of the *Miranda* rights. During the pre-

test interview, the appellant asked the officer, "Did you find any blood on my clothes or in the car; am I guilty yet?" When asked about the cuts on his sneakers, the appellant responded, "I don't know what you are talking about. You must have cut the sneakers." When a police officer accused the appellant of abducting the child, the appellant said, "Prove it."

A human hair with the same microscopic characteristics as fine hairs found on a hairbrush the child used was found on the floor mat of the driver's side of appellant's car. An expert testified that the hair could not, however, be identified as the child's hair to the exclusion of anyone else, unlike fingerprint identification.

Two dyed rabbit hairs were found on the passenger's seat of the appellant's car. They were microscopically consistent with, and contained the same dye components as the rabbit hairs in a coat the child's mother wore to the party and the rabbit hairs found on one of the child's nightshirts. A comparison of the rabbit hairs in the car and those from the mother's rabbit fur coat, using thin-layer chromatography, revealed no differences between the dye components used to color the hairs.

Immediately before the child disappeared, she had put on her coat. Underneath the coat, the child wore a blue sweater with a Big Bird emblem on the chest. About fifty blue acrylic clothing fibers were found on the passenger's seat and one blue acrylic clothing fiber was found on the driver side of the appellant's car. These fibers were microscopically consistent with blue acrylic fibers found on the blazer worn by the child's mother to the party, blue acrylic fibers found on a hairbrush used by the child, and blue acrylic fibers found on one of the child's coats.

The police obtained a duplicate of the outfit worn by the child on the evening she disappeared, the sweater and a red plaid skirt. The duplicate outfit had been purchased from the J.C. Penney catalog at about the same time the child's grandmother had ordered the child's outfit from J.C. Penney. The blue fibers found on the passenger's seat and driver's seat of the appellant's car were microscopically consistent with those in the duplicate outfit. In addition, the chemical composition of the fibers found in the car matched that of the fibers taken from the duplicate outfit. An expert testified that, in his opinion, the blue acrylic fibers found on the child's coat, the child's hairbrush, the mother's blazer, and the

front seat of the appellant's automobile "could have originated from" a sweater outfit like the duplicate outfit.

An expert also testified that a primary transfer of fibers from the child's sweater to the passenger seat of appellant's car had occurred. Primary transfer occurs when two surfaces come in direct contact. Secondary transfer occurs when a hair or fiber adheres to a different surface before being transferred to a third surface.

Ten red cotton fibers microscopically consistent with and matching red fibers in the skirt of the duplicate outfit were found on the passenger side of the appellant's car.

An almost colorless trilobal carpet fiber found in appellant's car was determined to be microscopically consistent with a carpet fiber taken from the child's nightshirt. An expert testified that these fibers "could have originated from the same source."

## II. SUFFICIENCY OF THE EVIDENCE TO CONVICT APPELLANT OF ABDUCTION WITH INTENT TO DEFILE

We agree with the panel majority for the reasons stated in its opinion that the evidence supports the finding that the appellant abducted the female child. We now decide whether the evidence was sufficient to support the jury's finding that appellant had an intent to defile her.

■ On appeal, the evidence must be viewed in the light most favorable to the Commonwealth and accorded all reasonable inferences to support a criminal conviction. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). The jury's verdict should not be set aside unless it is "plainly wrong or without evidence to support it." *Id.*; *see* Code § 8.01-680. Although the evidence in this case is entirely circumstantial, circumstantial evidence alone is sufficient to support a conviction. *Johnson v. Commonwealth*, 2 Va. App. 598, 604-05, 347 S.E.2d 163, 167 (1986).

■ All necessary circumstances proved must be consistent with guilt and inconsistent with innocence; they must exclude every reasonable hypothesis of innocence; the chain of these circumstances must be unbroken; and the "circumstances of motive,

time, place, means, and conduct must all concur to form an unbroken chain" linking the appellant to the crime beyond a reasonable doubt. *Bishop v. Commonwealth*, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984). Not all circumstances must be proved beyond a reasonable doubt, but the circumstances that are proved must concur in pointing to the appellant's guilt beyond a reasonable doubt. *See Stevens v. Commonwealth*, 8 Va. App. 117, 118, 379 S.E.2d 469, 470-71 (1989).

The Commonwealth was required to prove that the appellant "by force, intimidation, or deception, and without legal justification or excuse," seized, took, transported, detained, or secreted the missing child with intent to deprive her of her personal liberty or to withhold or conceal her "from any person, authority or institution lawfully entitled to [her] charge." Code § 18.2-47; *see Coram v. Commonwealth*, 3 Va. App. 623, 625, 352 S.E.2d 532, 533 (1987).

 Further, in order for the Commonwealth to prove that the abduction was with the intent to defile, it had to prove that the appellant abducted the child with the specific intent to sexually molest her. *Simms v. Commonwealth*, 2 Va. App. 614, 617, 346 S.E.2d 734, 735 (1986). "Intent is the purpose formed in a person's mind which may, and often must, be inferred from the facts and circumstances in a particular case." *David v. Commonwealth*, 2 Va. App. 1, 3, 340 S.E.2d 576, 577 (1986) (quoting *Ridley v. Commonwealth*, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979)). The state of mind of an accused may be shown by his conduct and by his statements. *Long v. Commonwealth*, 8 Va. App. 194, 198, 379 S.E.2d 473, 476 (1989). However, where an offense consists of an act combined with a particular intent, the intent must be established as a matter of fact, and "[s]urmise and speculation as to the existence of the intent are not sufficient." *Dixon v. Commonwealth*, 197 Va. 380, 382, 89 S.E.2d 344, 345 (1955).

 "[T]he question of [appellant's] intent must be determined from the outward manifestation of his actions leading to usual and natural results, under the peculiar facts and circumstances disclosed. This determination presents a factual question which lies peculiarly within the province of the jury." *Ingram v. Commonwealth*, 192 Va. 794, 801-02, 66 S.E.2d 846, 849 (1951). "[T]he [jury] may consider the conduct of the person involved and all the circumstances revealed by the evidence." *Wynn v. Common-*

*wealth*, 5 Va. App. 283, 292, 362 S.E.2d 193, 198 (1987). Indeed, "[t]he specific intent in the person's mind may, and often must, be inferred from that person's conduct and statements." *Martin v. Commonwealth*, 13 Va. App. 524, 527, 414 S.E.2d 401, 402 (1992) (citing *Hargrave v. Commonwealth*, 214 Va. 436, 437, 201 S.E.2d 597, 598 (1974)).

While the circumstantial evidence, particularly the fiber and hair evidence, proves beyond a reasonable doubt that the appellant abducted the child, the circumstances surrounding the child's disappearance, the fact that she has not been found, and the conduct of the appellant both before and after the child's disappearance support the conclusion that he abducted the child with the intent to defile her and thereafter disposed of her in an effort to avoid detection. *See Epperly v. Commonwealth*, 224 Va. 214, 294 S.E.2d 882 (1982). From the evidence, the jury readily and reasonably could have concluded the following: The missing child disappeared from the Christmas party at approximately the same time as the appellant. The appellant paid an inordinate amount of attention to the child up until the moment of her disappearance. Even though appellant lived slightly less than ten miles from the apartment complex he drove about fifty miles before arriving at home and did not arrive home until two and one-half to three hours after he left the party. When he finally arrived home some time after 12:30 a.m., and his wife told him of the calls from the police and apartment manager inquiring about his whereabouts, appellant became agitated about the calls. Before returning the calls, he washed the clothes and sneakers he was wearing in the washing machine, and he then took a shower.

When appellant returned the police officer's calls and spoke with an officer, he expressed annoyance that the officers called, and he deceitfully denied any knowledge of the child. He denied that he drove other than a direct route home and said he stopped only to buy beer. Although appellant offered evidence that washing his clothes late at night was not unusual, the jury could have reasonably inferred that it was highly unusual that he would wash his sneakers and his clothes at that late hour. Also, the jury was entitled to consider the fact that after the appellant washed his sneakers, an examination of them revealed a gouge mark caused by a sharp edge instrument and an analysis showed a trace of human protein believed to have come from human blood. Further-

more, the jury could find it unusual that, although appellant was very agitated about calls from the police to his home regarding the missing child, he showered before calling the clubhouse at 1:00 a.m., at which time he protested the calls. Appellant denied knowing the child, lied about his activities after her disappearance, and blamed the police for cutting his sneakers.[2] These are factors from which the jury could infer that appellant was concealing his guilt. *See Speight v. Commonwealth,* 4 Va. App. 83, 88, 354 S.E.2d 95, 98 (1984). Similarly, appellant's questions to the police, "Did you find any blood on my clothes or in the car; am I guilty yet," would allow the jury to infer that appellant was worried that the child's blood might be on his clothes.

The fiber evidence found in the appellant's vehicle strongly supports the finding that the appellant abducted the child, and also, because of the clothing from which it came, tends to show that the abduction was with the intent to defile. The combination of so many different fibers associated with the child, along with appellant's actions before and after the child's disappearance, was sufficient for a rational finder of fact to believe beyond a reasonable doubt that the fibers were from the child's clothing. It stretches credulity too far to explain, as a mere coincidence, the combination of so many fibers related to the child being in the car without her ever having been there. Furthermore, the abduction occurred on a bitterly cold evening, and it would have been unusual for the

---

[2] On the morning following the child's disappearance, Hughes was asked at the police station if he would provide the clothes that he was wearing on the night before. Hughes agreed and went with Officer Promisel to Hughes's home where Hughes directed Promisel to the basement where the washer and dryer were located. "[Hughes] removed a pair of jeans, a gray jacket, a Polo-like shirt, a pair of socks and then there was a hesitation, a very brief hesitation, and [Promisel] asked him what shoes he would have been wearing." Hughes looked "quizzical." There was a "hesitation" and Hughes responded that he would either have been wearing his work boots or a pair of sneakers. Promisel, noticing that Hughes was wearing boots, asked Hughes to look back into the dryer, "at which point, he did and he removed the sneakers from the dryer." Promisel noticed the marking on the insteps of the sneakers. Promisel said that he did not cut the sneakers or do anything to them once he got them. Promisel took the shoes back to the police department and handed them to Officer Grogan, who noticed that there were several cuts on them. Later, Officer Whidlin asked Hughes if Hughes had cut the sneakers and Hughes said "I don't know what you're talking about. You must have cut the sneakers." John Lewoczko, a tool mark expert, described the lefthand shoe as having "an elongated cut towards the back, on the side of the sole, and on the front portion, as well." He described the righthand shoe as having "an elongated gouged out cut area on the inside of the sole." It was his opinion that the gouge and cut marks were produced by a "single bladed tool, such as a knife."

child to have taken her coat off under normal circumstances. Thus, the presence of the child's clothing fiber, clothing other than the coat she wore, gave rise to a permissible inference that her coat had been removed for some purpose.

In *Ingram v. Commonwealth*, 192 Va. 794, 66 S.E.2d 846 (1951) the Supreme Court of Virginia found that the intent to rape could be inferred from an assault upon a woman, although the assailant made no sexually evocative statements or acts to suggest the intent to rape. The Court held that no hypothesis other than attempted rape was conceivable under the circumstances. *Id.* at 803, 66 S.E.2d at 851. Significantly, the Court found that the evidence negated any attempt by the accused to commit murder, arson, robbery, or mere assault and battery and held that the more natural and probable motive for an attack by a man of a lone woman at night was sexual in nature. In this case, we find the circumstances even more compelling than those in *Ingram*. A five-year-old female child is abducted by a male stranger. No effort is made at ransom and theft. Robbery, parental abduction, or personal animosity are excluded as motives. The only natural and reasonable explanation that flows from the evidence is that the abduction was for sexual reasons. Furthermore, the appellant's intense interest in sexual matters that evening at the Christmas party shows his state of mind.

■ The Commonwealth had the burden of excluding the reasonable hypotheses that the appellant abducted the child for a reason other than with the intent to defile her. The hypothesis that the abduction was with intent to defile must be one that reasonably and naturally follows from the evidence presented. However, the hypotheses that must be excluded are those that reasonably flow from the evidence and not from the imagination of defendant's counsel. *Turner v. Commonwealth*, 218 Va. 141, 148, 235 S.E.2d 357, 361 (1977).

Appellant argues that even if the evidence were sufficient to prove that he abducted the child, the Commonwealth has failed to exclude as a reasonable hypothesis that he may have (1) abducted the child because he liked children, found the child in his car, panicked, and then disposed of the child out of fear, (2) that he abducted the child for a childless couple, (3) that he abducted the child for ransom, (4) that he abducted the child for the child's father, or (5) that he abducted the child just to murder the child.

We hold a rational finder of fact could have found all of these hypotheses to have been excluded by the evidence.

If appellant "liked" children in the normal, instead of perverse sense, that does not explain why he abducted and disposed of the child in some manner that must have been most cruel and traumatic for the child. All of his actions make such an hypothesis ludicrous. The jury could have readily concluded that appellant did not like the child in a normal sense if he abducted the child and never returned her to her mother. Indeed, appellant's annoyance, instead of concern, when told the child was missing and his denial of having spoken to or even having seen the child, are inconsistent with the contention that appellant paid excessive attention to or abducted the child due to an innocent fondness of children.

Regarding the hypotheses that he might have kidnapped the child to give her to a childless couple, kidnapped her for ransom, or kidnapped her for her father, abduction for such purposes usually entails some preplanning, as opposed to a spontaneous and opportunistic action. Appellant's words and actions on the night of the abduction do not suggest any preplanning. He expressed a desire to get drunk that night and tried to pick up two women. He commented at the Christmas party that he would like to have sex with several women there, and he boasted of his marital infidelity. His acts were inconsistent with a preplanned kidnapping; rather, his words and conduct showed his desire for sexual activity as a priority that evening.

Regarding the theory of kidnapping the child for the child's father, the only evidence about the father was that he lived on the west coast and was so poor that he could only visit the child when the child traveled to Arkansas to visit her maternal grandparents. No evidence was presented that the father ever sought to obtain custody of the child or that child custody had been a problem. The likelihood that the father could or would have engaged an east coast surrogate to kidnap the child is a fanciful suggestion that has no basis in the evidence presented at trial.

None of the suggested hypotheses that the appellant may have had an intent other than to defile the child explains why after the party it was necessary for the appellant at 1:00 a.m. to wash his sneakers and his clothes and to shower before returning urgent

calls concerning the child.

Furthermore, regarding the hypothesis of kidnapping for ransom, no evidence was presented that the child represented any economic status that would have been attractive to a kidnapper for ransom.

Finally, the appellant suggests that the evidence does not exclude the hypothesis that if he abducted the child, he did so for the sheer, non-sexual pleasure of killing her, so that under an indictment charging abduction with the intent to defile, appellant could be found guilty of no more than the lesser-included offense of simple abduction. Nothing in the evidence supports the hypothesis that the abduction was merely to kill for killing's sake. Of course, the evidence does not exclude the hypothesis that appellant killed the child, and the evidence suggests that he may well have. However, if appellant killed the child, that inference supports the conclusion that he abducted her for sexual defiling and killed her in order to hide the evidence of the defiling.

■ "Inferences and deductions from human conduct may be properly drawn when they follow naturally from facts proven." *Ingram*, 192 Va. at 803, 66 S.E.2d at 851. The evidence in this case proves that appellant had a sexual motive that evening as opposed to any other motive. Appellant expressed his sexual desires by both word and act before the abduction. Appellant spent much of his time at the Christmas party standing alone staring at women, including the child's mother. The evidence showed that when he talked to a male, he talked about his sexual infidelity and pointed out women who sexually attracted him. He also asked two women to leave the party with him. From all of this, the jury could believe that appellant was sexually focused up until he abducted the child. The removal of the coat of a shy child who was afraid of strangers on such a bitterly cold night is a circumstance consistent with abducting the child with the intent to defile her.

Appellant would have the court consider otherwise innocent circumstances in isolation and conclude that each circumstance standing alone proved nothing concerning his guilt. But that approach denies reality. Circumstances do not exist in isolation of one another but exist together with every other proven fact and circumstance in the case. The fact that appellant abducted a five-

year-old female child who was a stranger to him and who has never been heard from since, when no other purpose reasonably flows from the evidence, supports the inference that his abduction was with the intent to defile the child. When the circumstances surrounding the abduction are considered, appellant's inexplicable guilt-implying behavior and comments to the police, and his general attitude after the abduction, the jury's finding that he abducted the child with the intent to defile her is amply supported by credible evidence.

Like *Ingram*, not only does the evidence here exclude any other reasonable hypothesis, it leaves the defiling motive as the sole, reasonable hypothesis arising from the evidence. Therefore, we hold that the facts and circumstances support the finding that appellant abducted the child with the intent to defile her.

## III. DISCOVERY OF EXCULPATORY EVIDENCE

Next, appellant argues that the Commonwealth failed to disclose exculpatory evidence pursuant to court order or as required by *Brady v. Maryland*, 373 U.S. 83 (1963). The panel held that upon retrial the Commonwealth should disclose all of their "lead sheets," particularly a letter written by Hilton Cobb, a government lawyer, statements appellant made to a police officer while he took a polygraph exam, and statements he made to two apartment complex managers. The panel also held that the Commonwealth should have disclosed statements made by three persons who were present when the abduction took place. Because we are not reversing and remanding on whether the evidence proved an intent to defile, we address the issue whether appellant is entitled to a new trial because these statements were not produced at or before trial.

Under principles established in *Brady v. Maryland*, 373 U.S. 83 (1963), the Commonwealth must turn over evidence favorable to an accused that is material to either guilt or punishment. *Id.* at 87. In *United States v. Bagley*, 473 U.S. 667 (1985), the Court set forth the test for materiality, finding that evidence is material, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682.

The [*Bagley*] Court also made clear that the defendant has the burden of demonstrating that the State *withheld favorable evidence* and . . . that defendant would have obtained a different result had he use of the evidence.

*Maynard v. Dixon*, 943 F.2d 407, 417 (4th Cir. 1991), *cert. denied*, 502 U.S. 1110 (1992) (emphasis added).

■ "A defendant cannot simply allege the presence of favorable material and win reversal of his conviction." *United States v. Balliviero*, 708 F.2d 934, 943 (5th Cir. 1983). Rather, a defendant must *prove* the favorable character of evidence he claims has been improperly suppressed. Speculative allegations are not adequate. *See United States v. Barshov*, 733 F.2d 842, 848 (11th Cir. 1984), *cert. denied*, 469 U.S. 1158 (1985). *See also Black v. Collins*, 962 F.2d 394, 406-07 (5th Cir.), *cert. denied*, 112 S. Ct. 2983 (1992).

In *Lowe v. Commonwealth*, 218 Va. 670, 239 S.E.2d 112 (1977), *cert. denied*, 435 U.S. 930 (1978), the Supreme Court of Virginia held that at the core of the due process rule concerning exculpatory evidence "is that the evidence must be exculpatory, favorable to the accused." *Id.* at 679, 239 S.E.2d at 118. The Court held that that "critical basic fact" may not be assumed by the appellate court where it is not demonstrated in the record and that conjecture is insufficient to establish a claim of a *Brady* violation. *Id.*

Relying on *Lowe*, the Supreme Court of Virginia in *Ramdass v. Commonwealth*, 246 Va. 413, 437 S.E.2d 566 (1993), held:

In order to establish that the Commonwealth has violated a defendant's *Brady* rights, *the record* must indicate that the undisclosed evidence was *in fact exculpatory and material* either to guilt or to punishment.

*Id.* at 420, 437 S.E.2d at 570 (emphasis added). The *Ramdass* Court found that the defendant's speculation about "potentially exculpatory evidence" contained in accomplices' polygraph tests was inadequate to establish the claim. *Id.*

In this case, the police received over 900 leads from persons who called or wrote them and offered help, information, or sugges-

tions about finding the child. The Commonwealth disclosed those leads which claimed actual sightings of the child. The panel held that the Commonwealth's "refusal to disclose *all* of the lead sheets as ordered undermines judicial authority." However, the record shows that the trial judge *did not* require the Commonwealth to turn over "those [lead] sheets which were out of time with the facts or were patently unreliable." Nevertheless, the panel found the Commonwealth should have turned over to appellant the lead sheet of Hilton Cobb, a government lawyer.

Cobb had reported to the police that he was on the Metro the day after the kidnapping and had gotten a glimpse of a child fitting the description of the missing child. Cobb said he only got a "glimpse" of the child's face when a flap of a large coat used to cover the child accidently fell away from her face. He could not describe or identify the child. For that reason, the police officer who took Cobb's statement said that he did not give it enough credence to mandate a follow-up investigation.

Cobb subsequently called the police back on two separate occasions. The first time he called to follow up on the progress of his lead. However, because he was unable to provide any substantial description of the child, except that she was a white female whom he had seen just momentarily, the police did nothing to investigate the information.

Cobb later called back to follow up on his lead, at which time he questioned several of the police department's procedures and strategies regarding the investigation. He suggested that the police should investigate whether the child had been made a slave. Cobb expressed his desire to assist the police directly in the investigation. Because Cobb provided the police with no factual information from which they could work, no further investigation of his "lead" occurred.

Sometime later, but before the trial, Cobb wrote a lengthy letter addressed to the child's mother. He mailed it to the police with instructions to forward it to the mother. In the letter, contrary to what he had told the police, Cobb wrote that he was "absolutely certain" he saw the child. Cobb wrote that the woman who purportedly held the child appeared not to want him to approach the area where she and a man were seated. He also wrote that the woman got off the Metro with the child and had on her face a

look "as though she had accomplished what she wanted." He also wrote that the child's head had been shaved, a fact which had never been mentioned to the police. Cobb then proceeded to criticize the police investigation because they had not followed up on various investigative techniques that he had suggested they take on the day after his report. The letter concluded in a bizarre manner, assuring the child's mother that her daughter would return.[3]

When the police questioned Cobb about the letter in detail, he "backed up . . . and kind of recanted" his previous assertions, stating, "Well, maybe it wasn't her." The police officer found Cobb to be inconsistent and unreliable, and, thus, the Commonwealth did not turn the letter over to appellant. Several months after the trial, Cobb mailed a copy of the letter to appellant's lawyer.

At the hearing on the motion to set aside the verdict based on Cobb's letter, the appellant did not call Cobb as a witness. The appellant only introduced Cobb's letter and a statement by Cobb that he stood by the letter. The Commonwealth called the police officer who dealt with Cobb to establish that Cobb was not credible. We find Cobb's telephone calls and letter laden with inconsistencies. His statements provided no facts that gave the account credibility.

Furthermore, at trial, the appellant put on six witnesses who testified that they had seen a person who looked like the child at a Pizza Hut following the abduction. The jury chose not to believe their testimony. Similarly, there was no showing that Cobb's testimony probably would have been believed. In view of the other evidence, we cannot find that the jury would probably have reached a different result.

The police spoke with three witnesses who were present at the approximate time of the abduction, one of whom testified at trial. The record indicates that appellant had been advised of the substance of their statements. There is no reasonable probability that, had the evidence been disclosed, a different result would have occurred. *Bagley*, 473 U.S. at 683.

---

[3] Cobb's letter concluded: "Finally, I am not going to say what I'm about to say to try and make you feel better or to give you hope. I shall say it because I really do believe it. I believe that Melissa is in good shape and in good hands. I mentioned the look of joy on that woman's face. There was indeed such a look on her face. I believe that she is taking good care of Melissa and that Melissa will be returned to you safe and sound."

While taking a polygraph exam, appellant made statements to Fairfax police officer Danielle. Appellant also spoke with the apartment complex managers, Keefer and Moore, at some point during the investigation. Neither statement was disclosed to appellant.

We also find that appellant's statements made to the apartment complex managers, along with the statement he made to the police officer during the polygraph exam, were inculpatory and not exculpatory. Moreover, the Commonwealth was not required to disclose the statements he made to Moore and Keefer because they are not law enforcement officers. Rule 3A:11(b)(1)(i); *Jeffries v. Commonwealth*, 6 Va. App. 21, 27, 365 S.E.2d 773, 777 (1988). Furthermore, the statements made to Keefer and Moore were not used by the Commonwealth at trial. Therefore, the failure to disclose these statements, even if in violation of the discovery requirements, was harmless and probably would not have resulted in a different trial outcome.

## IV. DISCOVERY

Appellant argues that the Commonwealth failed to turn over six items in discovery and that the trial court erred in failing to provide a discovery cut-off date. Before trial, appellant sought and obtained orders requiring the Commonwealth to produce certain materials for discovery and inspection under Rule 3A:11.

"When a discovery violation does not prejudice the substantial rights of a defendant, a trial court does not err in admitting undisclosed evidence." *Davis v. Commonwealth*, 230 Va. 201, 204-05, 335 S.E.2d 375, 377-78 (1985). If the defendant shows no prejudice, he can claim no error. *Id.* at 205, 335 S.E.2d at 378. Here, appellant failed to show how a failure to produce this evidence, or the denial of a discovery cut-off date, caused any prejudice. Assuming that these documents were exculpatory, as the panel found, we hold that in view of all of the other evidence and circumstances proved, the record does not support a finding that they would probably have led to a different result.

Accordingly, the judgment of the trial court is affirmed.

*Affirmed.*

Baker, J., Willis J., and Bray, J., concurred.

Coleman, J., concurring.

As a member of the panel that first considered Caleb Hughes's appeal, I voted to reverse his conviction on the ground that the evidence was insufficient to prove that he intended to defile the female child when he abducted her. *See Hughes v. Commonwealth*, 16 Va. App. 587, 602, 431 S.E.2d 906, 922 (1993). I am now persuaded that this view was incorrect. I erroneously concluded that, because the evidence did not exclude an intent by Hughes to commit acts against the child other than to defile her, the evidence was insufficient to prove the charged crime. I am now persuaded that by applying the correct legal principles, the evidence is sufficient to prove beyond a reasonable doubt that Caleb Hughes intended to defile the child when he abducted her. Because my vote is pivotal to decide this issue *en banc*, I write separately in order to explain the reasons that compel me to change my vote.

I joined in the panel's majority decision to reverse the conviction for abduction with the intent to defile because the evidence "did [not] eliminate other possible motives" for the abduction. *Id.* at 587, 431 S.E.2d at 913. I reasoned that because the evidence and inferences reasonably deducible therefrom equally supported the conclusion that Hughes may have intended other unlawful acts against the child, in addition to the intent to defile her, the Commonwealth had not satisfied its burden of proving the specific intent to defile, to the exclusion of an abduction for other purposes. More specifically, I reasoned that because the evidence was as susceptible to a reasonable inference that Hughes abducted the child intending to kill her, rather than to sexually molest her, the conviction could not stand.

I was wrong. Where specific intent is an element of an offense, particularly where it is the element that differentiates the degree of the crime, the Commonwealth must prove beyond a reasonable doubt that the accused at the time harbored that specific intention. *Ridley v. Commonwealth*, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979). The proof cannot leave indifferent what the accused may have intended. *Id.* However, a person often acts with two or more criminal intentions. A person may commit a crime with more than one purpose, and the fact that the act is done with two or more specific objectives does not mean that the Commonwealth has failed to prove the specific intent to commit the charged

crime. Thus, when the Commonwealth proves beyond a reasonable doubt that an accused has committed a criminal act with both a primary and a secondary purpose in mind, both or either of which purposes are criminal, the Commonwealth has met its burden of proving the element of specific intent. *See, e.g., United States v. Snow*, 507 F.2d 22, 24 (7th Cir. 1974); *O'Neal v. United States*, 240 F.2d 700, 702 (10th Cir. 1957). By proving that an accused harbored two or more specific criminal intents, the Commonwealth has excluded every reasonable hypothesis of "innocence." It is only where the proof leaves indifferent what the purpose or intentions of the accused were that the Commonwealth's proof fails or is insufficient to establish the element of specific intent. The Commonwealth satisfies its burden of proof when it establishes that the accused had the specific intent to commit the crime charged, even though the proof may equally support an inference that the accused intended to commit, or did commit, the crime with other purposes in mind, some of which may not have been criminal. *See id.*

Although I was unpersuaded by that part of the panel's opinion which held the evidence and reasonable inferences that could be drawn therefrom "did [not] eliminate other possible motives," such as "to extort money," or "for the purpose of concubinage or prostitution," or "parental abduction," *Hughes*, 16 Va. App. at 587, 431 S.E.2d át 913, I concluded that because the child had never been found, the evidence and reasonable inferences equally supported the conclusion that Hughes abducted the child and killed her. *See Epperly v. Commonwealth*, 224 Va. 214, 229, 294 S.E.2d 882, 891 (1982). Applying this same line of reasoning, I concluded that, because the evidence equally supported the inference of an intent to kill, the evidence did not prove beyond a reasonable doubt an intent to defile. I did not fully agree with the reasoning in the panel's opinion that the evidence equally supported the other possible motives that Hughes may have had for abducting the child, because neither the circumstances that existed between the accused and the victim nor any other evidence in the record tended to prove that Caleb Hughes may have had extortion, parental kidnapping, selling children, concubinage, or prostitution as reasons for abducting the child. Nevertheless, because I found that the evidence supported the conclusion that Hughes abducted the child intending to kill her, as strongly as that he intended to defile her, I errdneously concluded that the

Commonwealth had failed to exclude every reasonable hypothesis except that Hughes was guilty of abduction with the intent to defile.

For the reasons stated in the *en banc* opinion, I agree that the evidence and inferences that reasonably can be drawn from a man abducting a young girl who was a stranger to him, and who has not been seen since, when considered in light of all the surrounding circumstances, proved that Hughes abducted the child for the purpose of sexually molesting her, even though he may have had other reasons for the abduction.

For the foregoing reasons, I concur in the decision to affirm Caleb Hughes's conviction for abduction with intent to defile.

Barrow, J., with whom Koontz, J., joins, dissenting.

The evidence does not, in my opinion, support an inference that the defendant abducted the child with the specific intent to sexually molest her. The facts that the defendant abducted the child and that she has not been found do not mean that the defendant did so intending to molest her. The evidence provokes speculation but does not provide a reasonable basis for inferring what the defendant specifically intended to do, or in fact did, with the child.

The Commonwealth had the burden of proving not only that the defendant abducted the child, but that he did so with the intent to sexually molest her. *See Simms v. Commonwealth*, 2 Va. App. 614, 617, 346 S.E.2d 734, 735 (1986). This intent "may, and often must, be inferred from the facts and circumstances in a particular case." *David v. Commonwealth*, 2 Va. App. 1, 3, 340 S.E.2d 576, 577 (1986) (quoting *Ridley v. Commonwealth*, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979)). A person's conduct and statements may reveal a person's intent. *Long v. Commonwealth*, 8 Va. App. 194, 198, 379 S.E.2d 473, 476 (1989). However, where an offense consists of an act combined with a particular intent, the intent must be established as a matter of fact, and "[s]urmise and speculation as to the existence of the intent are not sufficient." *Dixon v. Commonwealth*, 197 Va. 380, 382, 89 S.E.2d 344, 345 (1955) (sexually suggestive telephone calls made prior to a burglary are insufficient evidence of breaking and entering with intent to commit rape).

Although the majority concludes that the jury could have found "as a matter of fact" that the defendant intended to sexually molest the child, in my opinion, it could have done so only through "surmise and speculation." The majority relies on the circumstances surrounding the child's disappearance, the fact that she has not been found, and the conduct of the defendant both before and after the child's disappearance to conclude that the defendant sexually molested the child. In my opinion, these facts fall short of proving the defendant's intent beyond a reasonable doubt.

The only circumstance surrounding the child's disappearance, as distinguished from the defendant's conduct, relied upon by the majority, is the fibers found in the defendant's car. The presence of so many fibers consistent with those identified with the child permits an inference that she was in the defendant's car in the passenger seat where the fibers were found. This inference supports a finding of abduction but not sexual molestation. The presence of fibers like those from clothing similar to the child's may permit one to infer that she leaned against the seat without her jacket, but it does not permit one to find, beyond a reasonable doubt, that this event occurred as a result of sexual molestation, rather than from her jacket pulling up in the back when she sat down or from her removing her jacket for some other reason.

The fact that the child has not been found does not give rise to an inference that the defendant intended to sexually molest the child. Had she been found, but with no evidence of actual or attempted sexual molestation, a jury could not have speculated, with no more evidence than in this case, that the defendant had intended to sexually molest her. The failure to find the child does not enhance this possibility. To the contrary, the fact that she has not been found may, along with other circumstances, be evidence of her death by a criminal act or agency of another. *See Epperly v. Commonwealth*, 224 Va. 214, 229, 294 S.E.2d 882, 891 (1982). It is not evidence that she was sexually molested.

The defendant's conduct is suspicious. He took an unusually long time to get home, he drove an unnecessary distance going home, and then he washed his clothes and sneakers when he arrived home. This behavior tends to support the finding that he abducted the child. It does not, however, indicate what he did or intended to do with the child.

The condition of the defendant's shoes adds little, if anything, relevant to his intent. The Division of Consolidated Laboratories did not find blood on them, and the examiner could not recall cut marks being on the sneakers when she examined them. The marks were present when the sneakers were introduced into evidence, and testimony indicated they were present when the police received the sneakers from the defendant. Even if the jury inferred from this evidence that the defendant cut the sneakers, it could not infer from this fact that the defendant intended to molest the child.

The police did not find the child's blood on the defendant, his shoes, or in his car. Although a prosecution witness testified that blood on a tissue found in the defendant's car was the same type as the child's blood type, a later prosecution witness established through a DNA test that this blood was not the child's.

The majority places significance on the defendant's interest in adult women at the party. He told the resident manager of the apartment complex, a woman, that he would not run an errand unless she went with him. He remarked to another man, while also boasting of his marital infidelity, that the women at the party were "nice looking" and that he would "like to go to bed with them." Finally, he asked one woman present if she would go dancing with him. Although these remarks were crude and inappropriate, I do not agree with the majority's characterization of them as reflecting an "intense interest in sexual matters." More importantly, without a better knowledge of the psychodynamics involved, a jury cannot infer from the defendant's crudely expressed interest in adult members of the opposite sex that he intended to molest a child.

Not only does the evidence fail to show affirmatively that the defendant intended to sexually molest the child, it also fails to eliminate other possible motives. He may have abducted the child for ransom and, for some unknown reason, changed his mind and killed her to avoid detection. He may have abducted her to give or sell to someone else. The possibility of parental kidnapping motivated by the estranged father, although not proven, was not eliminated by the prosecution's case. The defendant has no burden to prove any of these possibilities. The prosecution, however, having failed to produce affirmative evidence of an intent to sexually abuse the child, was required to eliminate all other possibilities

before the jury could reasonably infer a specific intent to sexually molest the child.

In essence, I read the majority to say that a jury may infer an intent to sexually molest a child from the fact that an adult male, who has expressed crude sexual remarks about adult women, has abducted a female child. Our desire to protect a small child from such a fate may justify an enhanced penalty for such an offense, and the General Assembly could provide that a greater penalty be imposed whenever an adult abducts an infant of which he or she is not a parent. However, the tragic circumstances of this case do not justify the creation of an inference based on an uninformed assumption regarding human behavior.

Such an unwarranted inference will generate disparate application of the law. The inference will be seized upon by triers of fact in some cases, while in other like cases it will not be. Therefore, I would reverse the judgment of conviction and remand the proceeding for a new trial, leaving to the prosecution to more appropriately indict the defendant, if the facts so justify. *See Epperly*, 224 Va. at 229, 294 S.E.2d at 891.

In addition, for the reasons stated in the panel's majority opinion, I would further hold that the evidence of the trilobal fiber found in the defendant's car was too remote to have any probative value and should not have been admitted. Because I would reverse for other reasons, I do not address whether this error was harmless.

Finally, also for the reasons stated in the panel's opinion, I would hold that certain material identified in the panel's opinion should have been produced by the prosecution; however, because I would reverse for other reasons, I do not address the materiality of the items.

Benton, J., dissenting.

I join in the discussion and conclusion in Judge Barrow's dissenting opinion that the evidence did not prove beyond a reasonable doubt "intent to defile," a necessary element of the charged offense. Code § 18.2-48. Because I do not believe that the evidence proved beyond a reasonable doubt that Hughes abducted the child, I do not join in the entirety of Judge Barrow's dissent. For that reason and for the reasons stated in my opinion concur-

ring in and dissenting from the opinion of the panel that first considered this appeal, *see Hughes v. Commonwealth*, 16 Va. App. 576, 596-602, 431 S.E.2d 906, 919-22 (1993) (Benton, J., concurring and dissenting), I would reverse the conviction.

Elder, J., dissenting in part and concurring in part.

I join in Judge Barrow's dissenting opinion except as it relates to evidence of the trilobal fiber found in the defendant's car. I join the majority in holding that evidence admissible.

Because I would reverse on the sufficiency issue and because the defendant now has the disputed evidence, it is not necessary to address that issue in detail. However, of particular concern is the failure of the prosecution to divulge the lead sheet regarding Hilton Cobb. Not only is this evidence exculpatory and material, but the trial judge had ordered that lead sheets of this type be disclosed. Just as it is not the province of this Court to determine the credibility of witnesses, it is not the Commonwealth Attorney's role to unilaterally determine that Mr. Cobb's information is unreliable.