COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Fitzpatrick, Judges Annunziata and Agee
Argued at Alexandria, Virginia


WILLIAM GARRISON, JR.

OPINION BY
v.   Record No. 1620-00-4          JUDGE G. STEVEN AGEE
JULY 31, 2001
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Thomas D. Horne, Judge

Joseph R. Winston, Special Appellate Counsel
(Public Defender Commission, on brief), for
appellant.

Susan M. Harris, Assistant Attorney General
(Mark L. Earley, Attorney General, on
brief), for appellee.


William Garrison, Jr. (Garrison) was convicted in the

Loudoun County Circuit Court, pursuant to a conditional guilty

plea, of stealing a credit card on or about June 28, 1999, in

violation of Code § 18.2-192, credit card forgery, in violation

of Code § 18.2-193 and credit card fraud, in violation of Code

§ 18.2-195.  The trial court sentenced Garrison to serve a term

of one year and six months incarceration.

Pursuant to the conditional plea, Garrison now appeals

averring the trial court erred in denying his motion to suppress

statements he made to Leesburg police officers.  Garrison

complains the motion should have been granted because the police

officers lacked a reasonable, articulable suspicion to detain

him. In addition, Garrison avers the trial court erred, at the hearing on the motion to suppress, by (1) excluding from evidence Garrison's subjective belief that he was in police custody and (2) admitting certain hearsay evidence. For the following reasons, we disagree and affirm the decisions of the trial court.

## I. BACKGROUND

On July 8, 1999, Officers Daly and Pebler of the Leesburg Police Department were called to Dulles Motorcars, a car dealership. The proprietor of the dealership, Jeffrey Collins, complained that a customer's wallet and credit card were stolen from a car left for service on June 28, 1999. Collins suspected Garrison, an employee, to be the thief because he had access to the car when it first came in and left "unexpectedly within a few minutes." Collins also informed the police officers that a worker from K-Mart had "heard about a transaction where (Garrison) went and bought a battery charger and some jumper cables with a credit card and that those items were at this person's girlfriend's house or apartment." Collins showed the officer a carbon of the credit card receipt from K-Mart, explaining it was not the victim's handwriting.

As a result, the police officers resolved to "follow up on this and see if there was anything to this." They interviewed some dealership employees and thought it "would be a good opportunity" to interview Garrison. However, when they

-

approached Garrison's department, he had "for whatever reason, left the business again on foot and started walking from Dulles Motorcars toward the Douglas Community Center," which was nearby.  A co-worker had informed Garrison that "the police are coming back here for you right now."  By police radio, Officers Daly and Pebler issued a lookout for Garrison and "completed [their] interview very quickly and started moving in the direction we thought [Garrison] had gone."

As the officers were leaving Dulles Motorcars, they received a communication from Officers Amato and Rourke that they "had seen [Garrison] and that they were detaining him for us to talk to him."  Approximately one minute passed between the time the lookout was issued and Garrison was spotted.  Officers Amato and Rourke, who were in plain clothes, saw Garrison in the Douglas Community Center, so they pulled into the parking lot, stopping about ten feet from him.  Garrison "continued to walk toward the officers."

Officer Rourke never exited the car, but he opened his door and informed Garrison other officers were on their way and wanted to talk to him.  Rourke did not order Garrison to stop, point a weapon or put hands on him.

Officer Amato knew Garrison from past "dealings" with him. As Officer Amato stepped out of the car, Garrison greeted him. The officer "greeted him back and said something like 'hey man, what's going on?'  [Officer Amato then said] 'I think these guys

-

want to talk to you' and that's when [Pebler and Daly] pulled up."  Officer Amato did not put his hands on Garrison or draw his weapon.  He remained away from Garrison next to his vehicle while they spoke.

Officers Daly and Pebler arrived in the parking lot approximately thirty seconds later.  Officers Amato and Rourke left as soon as the others began speaking with Garrison.

Officer Pebler spoke to Garrison in the parking lot.  He told Garrison that he had evidence Garrison might have been involved in a theft at the car dealership and that the officers would like him to talk with them at the police station.  Garrison asked what the officers wanted to speak to him about.  Officer Pebler told Garrison that they would discuss everything with him at the police station, but that Garrison was "free to go and would be free to go when [they] concluded [their] conversation."  He further stated that Garrison could refuse to go.  Garrison agreed to go with the officers.

Garrison "got into the [police] car" but was not "put into the car."  The car doors were not locked.  The ride to the police station took approximately one minute.  The officers and Garrison walked into the station and went into an interview room off the lobby.  While entry to the interview room required a passkey, a person could exit at any time without a key.  Garrison was seated by the door with the police officers across a table facing him and the door.  Garrison had unimpeded access

-

to the door.  Officer Pebler again advised Garrison that he was free to leave at any time.  Garrison did not ask to leave and did not ask for a lawyer.

Officer Pebler reviewed with Garrison the evidence that he had at that point.  Garrison "admitted that he had taken the credit card, but not the wallet . . . and [had] left work and went to the K-Mart store on his break and purchased a battery charger and jumper cables."  Garrison voluntarily wrote these "very same facts" down on paper at the police officer's request. Garrison was "very cooperative and it was a cordial conversation."  Garrison was never read the Miranda rights.

Officer Pebler and Garrison were in the interview room for approximately thirty minutes.  Office Pebler left the room once. Officer Daly was in and out and never spoke to Garrison.  When Garrison completed his written statement, Officer Pebler asked him if he wanted a ride home.  Garrison declined the offer and left the station.

At the suppression hearing, Garrison gave a slightly different version of his encounter with the four police officers.  Garrison claimed Officer Amato had informed him in the parking lot that "he needed me to stay here."  Further, he claimed Officer Amato did not know why Garrison needed to stay. Garrison testified that he did not feel free to leave because he had witnessed Officer Amato chasing people in the past and that walking off would "create a problem that wasn't necessary at the

-

time."  Garrison admitted that no officer raised his voice, pulled a weapon or put hands on him.

Garrison testified that Officer Pebler directed him to the police car and that, when he tried to get out, the door was locked.  Also, according to Garrison, he was never informed that he could leave after his arrival at the police station and he did not know the interview room door was unlocked.  He testified that once, when he was left by himself, he "touched the knob, but the door wouldn't open."

As to his statements regarding the stolen credit card, Garrison, on cross-examination, explained that he "told the police officer what he, what he asked me."

At the end of the presentation of evidence on the motion to suppress, the trial court found Garrison voluntarily went with the officers to the police station.  The trial court further found that Garrison knew he was in an unlocked room from which he was free to leave, but chose not to do so.  Finally, the court found Garrison spoke to the officers of his own free will and accord and that a reasonable person under the circumstances would have felt free to leave and under no compulsion to participate in the police interview.

> I think Mr. Garrison made a conscious
> decision on his own that he was going to
> stop and that he was going to see what these
> officers wanted. . . . Mr. Garrison made a
> voluntary decision on his own to stay there.

-

[Mr. Garrison] wasn't under arrest, he was free to leave.  [The officers] wanted to talk to him and they wanted to do it down at the police station.  I don't think that a reasonable person of Mr. Garrison's circumstances there would have thought that he was under any compulsion by those police officers to have to do that.

   *      *      *      *      *      *      *

I think he voluntarily went to the station with the police officers.  I think that Mr. Garrison was led into a room that was right off the lobby, that was unlocked and Mr. Garrison was aware of that.

   *      *      *      *      *      *      *

He was told . . . that he was free to leave. I think being told that he also would have reason to believe that he didn't have to continue with this, he could leave at anytime.  He didn't want to.

   *      *      *      *      *      *      *

[I]n this case I don't think he was compelled in any way by the officers to agree to talk.

## II.  THE ALLEGED SEIZURE

In his first contention on appeal, Garrison argues that he was seized by Leesburg Police Officers Amato and Rourke in the community center's parking lot and this seizure continued until his release at the police station.  He avers that the police lacked a reasonable, articulable suspicion or probable cause to detain him and all evidence garnered as a result of the detention should have been suppressed by the trial court.

"At a hearing on a defendant's motion to suppress, the Commonwealth has the burden of proving that a warrantless search

or seizure did not violate the defendant's Fourth Amendment rights."  Reel v. Commonwealth, 31 Va. App. 262, 265, 522 S.E.2d 881, 882 (2000).  "It[, however,] is well established that, on appeal, appellant carries the burden to show, considering the evidence in the light most favorable to the Commonwealth, that the denial of a motion to suppress constitutes reversible error."  Motley v. Commonwealth, 17 Va. App. 439, 440-41, 437 S.E.2d 232, 233 (1993).  "Ultimate questions of reasonable suspicion and probable cause . . . involve questions of both law and fact and are reviewed de novo on appeal.  This Court is bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  Neal v. Commonwealth, 27 Va. App. 233, 237, 498 S.E.2d 422, 424 (1998) (citations omitted).

A.   The Encounter with Officers Amato and Rourke

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  This protection does not prohibit encounters between the police and citizens, but, rather, proscribes limitations on them.  Case law regarding the Fourth Amendment "has placed police-citizen confrontations into three categories."  Iglesias v. Commonwealth, 7 Va. App. 93, 99,

-

372 S.E.2d 170, 173 (1988).  "First, there are communications between police officers and citizens that are consensual and, therefore, do not implicate the fourth amendment."  Id.  Second, "are brief investigatory stops" based upon an officer's reasonable, articulable suspicion that criminal activity is afoot, and third, are "highly intrusive, full-scale arrests" based on probable cause.  Id.

We find Garrison's initial encounter with Officers Amato and Rourke to be a consensual exchange that was not prohibited by the Fourth Amendment.  A consensual encounter exists when "a reasonable person would feel free 'to disregard the police and go about his business.'"  Reittinger v. Commonwealth, 260 Va. 232, 236, 532 S.E.2d 25, 27 (2000) (citation omitted).  "Such encounters 'need not be predicated on any suspicion of the person's involvement in wrongdoing,' and remain consensual 'as long as the citizen voluntarily cooperates with the police.'"  Payne v. Commonwealth, 14 Va. App. 86, 88, 414 S.E.2d 869, 870 (1992) (citations omitted).

Garrison, who knew Leesburg police officers were interested in talking to him, walked toward the officers in the car, recognizing Officer Amato.  The officers did not approach him.  In fact, Officer Rourke did not exit the car.  Upon his approach, Garrison was informed other officers wanted to speak with him.  Garrison was not told he had to remain in the parking lot and wait for the other officers.  The evidence supports the

-

trial court's finding that Garrison acted voluntarily and that the brief encounter with Officers Amato and Rourke was consensual and did not implicate the Fourth Amendment. "Law enforcement officers do not violate the Fourth Amendment merely by approaching an individual on the street, identifying themselves and asking the individual questions." Buck v. Commonwealth, 20 Va. App. 298, 301-02, 456 S.E.2d 534, 535-36 (1995).

B. The Encounter with Officers Daly and Pebler

We also hold that Garrison's encounter with Officers Daly and Pebler was consensual. "A consensual encounter occurs when police officers approach persons in public places 'to ask them questions,' provided 'a reasonable person would understand that he or she could refuse to cooperate.'" Payne, 14 Va. App. at 88, 414 S.E.2d at 870 (quoting United States v. Wilson, 953 F.2d 116, 121 (4th Cir. 1991)). The trial court determined that a reasonable person in Garrison's situation would have felt free to refuse to cooperate and leave. Garrison was told that he could leave at any time and that he could refuse to talk with the officers. He voluntarily chose not to continue on his way, but to get into the police car for the one-minute trip to the police station, and to answer questions once there. Garrison could have walked away or required the questions be asked in the parking lot, but he elected not to do so. Garrison was not coerced into these actions, and he was not treated in a

-

confrontational manner.  He was not subject to a pat-down nor was he restrained or locked in.  Garrison was asked, not told, to participate in the interview.  The officers even offered to give Garrison a ride home when he was ready.

This case is distinguishable from McGee v. Commonwealth, 25 Va. App. 193, 487 S.E.2d 259 (1997), where we held the defendant had been seized for Fourth Amendment purposes when three uniformed police officers, who received an anonymous tip of drug sales at a particular site, approached the defendant near the given site and informed him that he matched the given description of the drug dealer.  The defendant was never informed he could leave the officers' presence and he was subjected to a frisk upon their arrival.

We held:

> [W]hen a police officer confronts a person and informs the individual that he or she has been specifically identified as a suspect in a particular crime which the officer is investigating, that fact is significant among the "totality of circumstances to determine whether a reasonable person would feel free to leave." When confronted with an accusation from police, such as, "we know you are selling drugs from this location, let us search you," no reasonable person would feel free to leave.

Id. at 200, 487 S.E.2d at 262.

However, we also noted "[w]hether a seizure occurs must be determined by evaluating the facts of each case to determine whether the manner in which the police identified the individual

-

as a suspect conveys to the person that he or she . . . is not free to leave."  Id. at 200-01, 487 S.E.2d at 262-63.

McGee's holding that a seizure occurred was not solely based on the statement to the defendant that he was suspected of presently dealing drugs, but on the totality of the circumstances which included the fact that the three uniformed police officers, who suddenly approached the defendant,

> did not by their words or actions suggest that the defendant was free to leave.  The unmistakable message conveyed to the defendant was that the officers had reason to suspect that he was [presently] selling drugs and that they were detaining him to investigate his [current] activity.  A reasonable person would have believed . . . that he or she was being detained and was required to [submit to the officers].

Id. at 201, 487 S.E.2d at 263.

Circumstances of a similar nature are not present in the case at bar.  The police officers asked Garrison if he would stop and talk about an investigation of his possible involvement and if he would talk with them at the police station instead of in the parking lot.  The police officers made no demand.  They specifically informed Garrison that he did not have to speak with them at that time and could leave.  Further, if he did choose to speak with them, he was free to leave at any time during the discussion. Under the totality of the circumstances in this case, the encounter between the police officers and

-

Garrison was consensual and, thereby, did not implicate the Fourth Amendment.

### C. The Police Station Interview

The fact that the interview took place in a police station does not mandate a finding that the encounter was non-consensual. "Custody does not result merely because an individual is questioned in a 'coercive environment,' or is the 'focus' of a criminal investigation." Davis v. Allsbrook, 778 F.2d 168, 171 (4th Cir. 1985) (citations omitted). "A person's voluntary appearance at a police station, where he is immediately advised that he is not under arrest and from which he leaves 'without hindrance' [sic] at the end of an interview, indicates that he is not in custody 'or otherwise deprived of his freedom of action in any significant way.'" Hughes v. Commonwealth, 16 Va. App. 576, 592, 431 S.E.2d 906, 916 (1993) (quoting Oregon v. Mathiason, 429 U.S. 492, 494 (1977)), aff'd en banc, 18 Va. App. 510, 446 S.E.2d 451 (1994).

We find no credible evidence to support Garrison's contention that the consensual interview changed to a custodial interrogation. He was free to leave at any time and voluntarily chose not to do so. Because Garrison was not subject to a coercive, custodial interrogation, he was not entitled to

-

<u>Miranda</u> warnings,[1] and the trial court properly admitted his statements.

    III.  ALLEGED ERROR IN CONDUCTING THE SUPPRESSION HEARING

    Garrison alleges the trial court erred by excluding any testimony from him as to whether he felt free to leave during the parking lot encounter with the police officers.  He also avers that the trial court erred in allowing hearsay testimony regarding his whereabouts on July 8, 1999.  Upon our review of the record, we find no error.

    A.  The Exclusion of Garrison's Subjective Belief

    Garrison states his "subjective belief" is relevant, relying on <u>Hughes</u>, 16 Va. App. 576, 431 S.E.2d 906.  Reliance on <u>Hughes</u>, however, is misplaced.

    Garrison relies on <u>Hughes</u> for the proposition that "[a] 'defendant's subjective belief regarding his freedom to leave' is relevant to determining whether a custodial interrogation had occurred."  16 Va. App. at 592, 431 S.E.2d at 917 (quoting <u>United States v. Charles</u>, 738 F.2d 686, 693 n.7 (5th Cir. 1984)).  However, following the <u>Charles</u> decision, the Supreme Court of the United States stated that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation" and the "objective, reasonable

---

[1] <u>Miranda</u> warnings are required only when an individual is in custody and subjected to interrogation.  <u>See</u> <u>Blain v. Commonwealth</u>, 7 Va. App. 10, 13, 371 S.E.2d 838, 840 (1988).

-

man test is appropriate because, unlike a subjective test, it 'is not solely dependent either on the self-serving declarations of the police officers or the defendant.'" Berkemer v. McCarty, 468 U.S. 420, 442 (1984) (footnote omitted). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).

The Fifth Circuit acknowledged that its decision in Charles was abrogated by the United States Supreme Court's subsequent adoption of the objective, reasonable man standard. See United States v. Bengivenga, 845 F.2d 593 (1988). We also believe that the United States Supreme Court's adoption of the objective, reasonable man standard prohibits us from considering the suspect's subjective belief or state of mind in determining whether a custodial interrogation occurred. Thus, the trial court did not err in refusing to allow Garrison to testify as to his subjective belief that he was in custody.

### B. The Inclusion of a Statement on Garrison's Whereabouts

Finally, Garrison challenges the admission of certain testimony by the police officer regarding a statement from Garrison's co-worker as to Garrison's whereabouts on July 8, 1999, when the officers wished to question him. Garrison argues

-

the statement should have been excluded as hearsay. We disagree.

The statement was admitted by the trial court, not as proof of the truth of the matter asserted, but, rather, as an explanation as to what caused the officers to issue a lookout for Garrison. In Upchurch v. Commonwealth, 220 Va. 408, 256 S.E.2d 506 (1979), the Virginia Supreme Court held that a detective's testimony that he responded to a radio report of a "burglary in progress" was not hearsay because the "hearsay rule does not operate to exclude evidence of a statement . . . offered for the mere purpose of explaining or throwing light on the conduct of the person to whom it was made." Id. at 410, 258 S.E.2d at 508. The trial court did not err in allowing the officers to describe the statement.

The rulings of the trial court were proper and supported by the evidence. Garrison's convictions are hereby affirmed.

Affirmed.

-