# CIRCUIT COURT OF ARLINGTON COUNTY

Commonwealth of Virginia

v.

Anthony Milton Accardi

December 10, 2001

Case No. CR01-1431

BY JUDGE PAUL F. SHERIDAN

The Commonwealth has charged Anthony Milton Accardi with first-degree murder in violation of Va. Code Ann. § 18.2-32. In his pretrial motion to suppress, Accardi claims that the Commonwealth obtained his confession to the crime charged in violation of the Fourth and Fifth Amendments to the United States Constitution and of Virginia and District of Columbia statutory law. For the following reasons, the Court denies the motion.

*Facts*

On May 28, 2001, officers of the Arlington County Police Department entered the District of Columbia in an effort to locate Anthony Accardi and other potential witnesses and suspects in conjunction with a homicide that had occurred days earlier in Arlington. After searching several District of Columbia neighborhoods, the officers, having received a tip, entered the

Greyhound Bus Terminal at Union Station. See Transcript at 28 (November 7, 2001). Upon entering the Bus Terminal, the officers visually identified Accardi and approached him as he was preparing to board a bus departing for Florida. *Id.*, at 28-32.

Initially, only one officer, Officer Giroux approached Accardi. Officer Giroux asked Accardi if he could speak with him, Accardi agreed, and the two men walked to an area several feet away where they could talk. *Id.*, at 36. At that point, Officer Giroux showed Accardi an identification card, identifying himself as an Arlington County police officer. Officer Giroux then informed Accardi that he was going to briefly place him in handcuffs and pat him down as a safety precaution. *Id.*, at 37-38. Accardi turned around, placing his hands on the small of his back. Officer Giroux handcuffed Accardi, patted him down and asked Accardi for identification, which Accardi indicated was in his pocket. Officer Giroux then asked Accardi if he could remove the identification, and Accardi agreed. *Id.*, at 38-39.

Once Accardi was handcuffed, Officer Giroux moved Accardi about six feet away, toward another officer, Officer Feltman, who was involved with two other individuals the police had entered the Bus Terminal looking for. At the suppression hearing, Officer Giroux testified that he moved Accardi because there were three individuals and only two officers on the scene. *Id.* at 40. Subsequently, the other officers in Officer's Giroux's "TAC" unit approached. Once the other members of the unit, four in all, arrived moments later, Officer Giroux removed the handcuffs. *Id.* at 41. Officer Giroux testified at the suppression hearing that the handcuffs were on for two to three minutes. *Id.* at 42. Furthermore, all officers at the Bus Terminal were dressed casually in plain clothes, and no officer either displayed a weapon or brought to Accardi's attention the presence of those weapons. *Id.* at 42-43.

Once the handcuffs were removed, Officer Giroux explained to Accardi that there "had been an incident in Arlington that a detective would like to speak with him about, and if he agreed ... [they] ... could take him to Arlington via automobile, and he could speak with the detectives." *Id.*, at 43. Accardi agreed to return to Arlington with the officers. *Id.* at 43-44. Accardi was driven to the Arlington Police Station in an unmarked police cruiser. His bags were also transported, in a separate police cruiser, to the station. See Transcript at 44 (November 7, 2001).

Once at the police station, Accardi accompanied officers to the eighth floor. He was not handcuffed, nor was he under any form of physical restraint. *Id.* at 45-46. Accardi was offered food and drink and allowed to move about the station freely in order to smoke a cigarette. Upon entering the interview room, Accardi was met by Detective Stephen Meincke and Detective Charles Penn. *Id.* at 136. Detective Meincke then advised Accardi

of his *Miranda* rights, reading the standard form used by the Arlington Police line by line to Accardi. At the suppression motion, Detective Meincke did minimize the importance of the *Miranda* warning stating that, "it's kind of a formality I got to go through. I'm just going to read you this, kind of get it out of the way." *Id.* at 174. Accardi indicated that he understood his rights and signed the *Miranda* waiver form the detectives presented to him. *Id.* at 141-142. However, Accardi's signature was on the wrong place on the form. Once the forms were signed, the interview continued. Shortly thereafter, Accardi confessed to the crime and was placed under arrest.

## Discussion

This case presents several issues concerning the Fourth and Fifth Amendments to the United States Constitution as well as District of Columbia and Virginia statutory law. For the following reasons, the Court finds: (1) The admission of evidence is a procedural issue and is consequently governed by the law of the forum state; (2) Even if the Arlington Police violated District of Columbia statutory law, the statutes do not provide for suppression of evidence in a criminal prosecution as a remedy; (3) The encounter at the Bus Terminal between Accardi and the Arlington Police was a consensual exchange and was not a seizure in violation of the Fourth Amendment; (4) Had the exchange been a seizure, the confession would have been excluded as "fruits of the poisonous tree;" and (5) The confession was given voluntarily and was not obtained in violation of the Fifth Amendment.

As an initial matter, this Court must determine whether Virginia or District of Columbia law governs the issues in this case. Under Virginia law, the admissibility of evidence is a procedural issue and, therefore, governed by the laws of the forum state. *Weaver v. Commonwealth*, 29 Va. App. 487, 492, 513 S.E.2d 423 (1999) (citing *Jackson v. Commonwealth*, 14 Va. App. 414, 416, 417 S.E.2d 5 (1992)). Therefore, the issues of admissibility must be decided in accordance with Virginia law.

The first argument Accardi proffers is that the Arlington Police violated several provisions of District of Columbia statutory law, including (1) assault, (2) stalking, and (3) kidnapping. See D.C. Code § 22-404, D.C. Code § 22-404(b), D.C. Code § 22-2001. Defendant asserts that the confession must be suppressed by virtue of such violations. However, under Virginia law Accardi's contentions are unfounded. Under Virginia law, "searches or seizures made contrary to provisions contained in Virginia statutes provide no right of suppression unless the statute supplies that right." *Troncoso v. Commonwealth*, 12 Va. App. 942, 944, 407 S.E.2d 349 (1991) (quoting *Commonwealth v. Brown*, 8 Va. App. 41, 44, 378 S.E.2d 623 (1989)). The

Supreme Court has uniformly recognized that evidence obtained in violation of constitutional proscriptions against unreasonable search and seizure may not be utilized against the accused. See generally *Weeks v. United States*, 232 U.S. 383, 58 L. Ed. 652, 34 S. Ct. 341 (1914); *Mapp v. Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684 (1961) (making *Weeks* applicable to the states). Nevertheless, the Virginia Supreme Court has "steadfastly refused to extend that rule to encompass evidence seized pursuant to statutory violations, absent an express statutory provision for suppression." *Troncoso*, 12 Va. App. at 944; see also *Hall v. Commonwealth*, 138 Va. 727, 733-34, 121 S.E. 154 (1924); *Thompson v. Commonwealth*, 10 Va. App. 117, 122, 390 S.E.2d 198 (1990); *Janis v. Commonwealth*, 22 Va. App. 646, 651, 472 S.E.2d 649 (1996).

In the present case, not one of the District of Columbia statutes relied upon by Accardi expressly provide for suppression of evidence in a criminal prosecution as a consequence of violation. As noted above, this Court will not read into the statute an intent to suppress by implication. Consequently, a violation of these statutes, alone, does not afford Accardi the remedy of suppression.

Although resolution of this issue is not required, it is doubtful under District of Columbia law that the Arlington Police violated either the assault or stalking statutes. In order to be guilty of assault, the Arlington Police must have intended to cause physical injury or engaged in threatening conduct with the intent to frighten the victim. See *Allison v. United States*, 623 A.2d 590 (D.C. App. 1993). As the Commonwealth pointed out in its brief, there is no evidence that the police intended to violate these statutes. However, the kidnapping statute, if resolution were necessary, would have been a closer case. The statute defines kidnapping as "seizing, confining, inveigling, enticing, decoying, kidnapping, abducting, concealing, or carrying away any individual by any means whatsoever, and holding or detaining, or with the intent to hold or detain, such individual for ransom or reward or otherwise. ..." D.C. Code § 22-2001. Even if the Arlington Police "seized" Accardi, under this statute, there was no intent to detain Accardi for "ransom or reward or otherwise." *Id.*

Despite the determination that District of Columbia law does not afford the remedy of suppression, this Court must still determine whether Accardi was seized in violation of the Fourth Amendment. Under United States Supreme Court precedent, an individual has been "seized" for purposes of the Fourth Amendment "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980); see also *Florida v. Royer*, 460 U.S. 491, 497, 75 L.

Ed. 2d 229, 103 S. Ct. 1319 (1983). Further, the Supreme Court has recognized that the *Mendenhall* test is "necessarily imprecise" and because it is "flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the action of the police." *Michigan v. Chesternut,* 486 U.S. 567, 573-74, 100 L. Ed. 2d 565, 108 S. Ct. 1975 (1988).

Accordingly, the encounter must be measured by an "objective standard — looking to the reasonable man's interpretation of the conduct in question." *Id.,* at 574. Therefore, our inquiry must focus on whether Accardi, in light of all the circumstances, could reasonably believe that he was not free to leave. In making this determination, this Court will look to several factors including, but not limited to (1) whether the police specifically accuse an individual of a crime, (2) the numbers of officers present, (3) whether the officers display weapons, (4) the place in which the encounter occurred, and (5) the nature and tone of the communications between the individual and the officers.

In light of this "reasonableness" standard, the Virginia Court of Appeals has addressed several cases with similar factual predicates but reached different results on fact-specific grounds. In *Watson v. Commonwealth,* 19 Va. App. 659, 454 S.E.2d 358 (1995), the police executed a valid search warrant of an apartment. During the search, the supervising officer informed other officers in the area "to be on the lookout for a black Dodge Shadow driven by a black male," although neither was named in the search warrant. *Id.,* at 661 (internal quotations omitted). A surveillance team observed a black Dodge Shadow enter a nearby parking lot, at which point the officers detained Watson, the occupant of the vehicle. *Id.* The officers informed Watson he was a suspect in a drug investigation, Watson exited the vehicle and was then handcuffed. When the surveillance team reported to the supervising officer, he ordered them to release Watson, but they did not do so. Shortly thereafter, a sergeant arrived and removed the handcuffs and "asked Watson to drive to the apartment to 'clear up the matter'." *Id.* Watson drove his own vehicle to the apartment with police driving directly in front of and behind his automobile. Upon arriving at the apartment, Watson was immediately arrested and given his *Miranda* warnings. While in the apartment, Watson made incriminating statements, was then transported to the city jail, again given *Miranda* warnings, and then repeated the incriminating statements. *Id.*

The Court of Appeals, speaking through then Judge Koontz, held that "under the circumstances ... a reasonably prudent person would not have believed he or she was free to leave" and that "once a person's freedom of movement is restricted through a seizure under color of law, the degree of

police conduct necessary to maintain the seizure is less than required to initiate it." *Watson*, 19 Va. App. at 663. Further, "a request that a detainee accompany a police officer to 'clear up a matter,' would import to a reasonably prudent person that 'the matter' … was not concluded and that the custody was continuing." *Id.* Thus, "even when … physical restraint of freedom is removed, the mere presence of police, insufficient in itself to create a seizure, is sufficient to continue a seizure absent some affirmative act which explicitly informs the detainee that he or she is free to leave." *Id.*, at 663-64.

Likewise, in *McGee v. Commonwealth*, 25 Va. App. 193, 487 S.E.2d 259 (1997), the police received an anonymous, non-specific tip that an individual was selling drugs on a certain street corner. When the police arrived they found McGee sitting on a porch in front of a store at the location the tip described. The officers approached McGee and informed him that they "had received a call that he was on this corner selling drugs and that he matched the description" of the informant's tip. *Id.*, at 196. The officers then asked McGee if they could "pat him down to make sure he didn't have any weapons on him." *Id.* McGee stood up and extended his arms with his fists clenched, and the officer asked him to open his hands. McGee opened his hands, which contained money, a broken ziplock bag, and a small white substance. McGee was then placed under arrest and a search incident to arrest revealed twenty-five bags containing crack cocaine.

The Court of Appeals found that McGee was seized in violation of the Fourth Amendment,[1] stating that when the police expressly inform an individual that they have received information that the individual is engaged in criminal activity, the police "convey a message that compliance with their

---

[1] Once the *McGee* court determined that there was a seizure, the court looked at whether the officers had reasonable suspicion for the seizure. 25 Va. App. at 199-200. However, in the case at bar, this level of analysis would be inappropriate. The Arlington Police were admittedly outside of their jurisdictional limits once they entered the District of Columbia. Consequently, for Fourth Amendment purposes these officers only maintained the arrest powers of a private citizens. See *Commonwealth v. Addison*, 36 Va. Cir. 411, 414 (1995). At common law "one private citizen may arrest another for a felony or for a breach of the peace committed in his presence." *Id.* (citing *Byrd v. Commonwealth*, 158 Va. 897, 902, 164 S.E. 400 (1932)); see also *Lima v. Lawler*, 63 F. Supp. 446, 451 (E.D. Va. 1945); 2A Michie's Jurisprudence, *Arrest*, § 4 (1993). The Commonwealth has conceded that there was no probable cause to arrest the Defendant, nor was there any evidence proffered that the Defendant committed a breach of the peace in their presence. Most importantly, private citizens may not conduct *Terry* stops.

request is required." *Id.* (quoting *Florida v. Bostick,* 501 U.S. 429, 435, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991)); see *Royer,* 460 U.S. at 501. Finally, and most conclusively, the court stated that when an officer merely identifies himself and informs the individual that he is conducting an investigation, without more, no seizure has occurred. *McGee,* 25 Va. App. at 199. Conversely, "[a] seizure occurs when an individual is either physically restrained or has submitted to a show of authority." *Id.* (citing *California v. Hodari D.,* 499 U.S. 621, 625, 113 L. Ed. 2d 690, 111 S. Ct. 1547 (1991)); *Ford v. City of Newport News,* 23 Va. App. 137, 142, 474 S.E.2d 848 (1996).

Conversely, in *Garrison v. Commonwealth,* 36 Va. App. 298, 549 S.E.2d 634 (2001), the Court of Appeals applied the same test used in both *Watson* and *McGee,* but reached a different result. In *Garrison,* the police responded to a call that a theft of a customer's wallet and credit card had occurred and that the employer suspected an employee, Garrison, of the crime. The officers left the store after conducting several interviews and received a call from other officers working the case that they "had seen Garrison and that they were detaining him for us to talk to him." *Id.* at 302. The officers never ordered Garrison to stop but did open their door and inform him that other officers were on their way and wanted to talk to him. The officers never pointed a gun at him or put their hands on him, and approximately thirty seconds later the investigating officers arrived. The investigating officers informed Garrison that they had information that he may have been involved in a theft and asked Garrison if he would like to talk with them at the police station. The officers also informed Garrison that he was "free to go and would be free to go when they concluded their conversation. He further stated that Garrison could refuse to go. Garrison 'got into the police car' but was not 'put into the car'." *Id.* at 302-03. Garrison was again informed, once arriving at the police station, that he was free to leave. Garrison chose to stay, did not ask for a lawyer, and later confessed to the theft.

The Court of Appeals concluded that no violation of the Fourth Amendment had occurred in the brief encounter with the first set of police officers. The initial encounter with the police was "a consensual exchange" because Garrison voluntarily cooperated with the police. *Id.,* at 306. The Court emphasized that the officers never exited the vehicle and never approached Garrison, and the court noted that "law enforcement officers do not violate the Fourth Amendment merely by approaching an individual on the street, identifying themselves, and asking the individual questions." *Id.,* at 306 (quoting *Buck v. Commonwealth,* 20 Va. App. 298, 301-02, 456 S.E.2d 534 (1995)). As to the second and primary encounter with the investigating officers, the *Garrison* court found this case distinguishable from *McGee.* The court concluded that "Garrison was not coerced into these actions, and he was

not treated in a confrontational manner. He was not the subject of a pat-down nor was he restrained or locked in. Garrison was asked, not told, to participate in the interview." *Garrison*, 36 Va. App. at 307. Further, the court determined that unlike McGee the police never affirmatively accused Garrison of the crime, or confronted him in a confrontational manner by informing him that he fit the description of the suspect. Moreover, in *McGee*, the suspect was never informed he could leave.

Based upon the relevant case law, particularly the precedent discussed above, the Court holds that Accardi was not seized in violation of the Fourth Amendment. Under the "reasonableness" inquiry, no one fact is dispositive. Virginia courts have never found that the use of handcuffs, alone, yields a per se seizure. Rather, the use of handcuffs must be viewed in light of all the circumstances. Here, the temporary use of handcuffs and the subsequent pat-down, accompanied by a clear explanation for the use of the handcuffs and the need for the pat-down, in conjunction with Accardi's voluntary agreement, do not compel a conclusion that he was therefore seized. In *Watson, McGee*, and *Garrison*, the Court of Appeals made specific reference to the use of force, or in this case the lack thereof. Under the totality of these circumstances, neither the momentary handcuffing, nor the safety search of Accardi that followed, would cause a "reasonable" person to believe that he was not free to leave after the removal of the handcuffs. In *Watson*, the Court of Appeals concluded that the defendant was still seized even after the handcuffs were removed because the police never affirmatively informed him that he was free to leave. The present case is distinguishable. Here, the Arlington Police never told Accardi that he was under arrest. These statements, militate in favor of a finding that no seizure, for purposes of the Fourth Amendment, occurred in this case.

Additionally, although Accardi's personal election to ride from the District of Columbia to Virginia in the front seat of an unmarked police sedan and his demonstrated willingness to acquiesce to that police request do not decide objectively what a "reasonable" person would do under the circumstances, this behavior does relate to the voluntary nature of the confession once in Arlington.

Other factors warrant this conclusion as well. Specifically, the police never accused Accardi of a particular crime, rather they expressed only a desire to discuss the incident with him. Also, the initial encounter was between Accardi and Officer Giroux only. Accardi asserts that he was seized the moment the handcuffs were placed on him. Therefore, even under Defense counsel's theory of the case, the question of seizure must be judged through the initial encounter, which again, was with only one officer. Consequently, Accardi agreed to return to Arlington before he was even

aware of the presence of other Arlington Police officers. Moreover, the officers never displayed their weapons or mentioned their presence and the encounter was in a crowded public place. Last, the officers, as admitted by both parties, never used a loud or forceful tone of voice with Accardi. Conversely, the officers maintained a conversational tone and meticulously avoided any threatening language, such as "if you don't do as we ask. ..." These actions, like those taken by the officers in *Garrison*, show that Accardi "was not coerced ... and he was not treated in a confrontational manner." 36 Va. App. at 307. In sum, the interaction between the Arlington Police and Accardi was a consensual exchange; Accardi was not seized and, therefore, Accardi's Fourth Amendment rights were not violated.

Because Accardi was not seized in violation of the Fourth Amendment, the confession cannot be excluded as "fruits of the poisonous tree." However, this Court concludes that, if the encounter between Accardi and the Arlington Police had been a "seizure," the confession would indeed have been excluded. The Commonwealth asserts that even if Accardi was seized in violation of the Fourth Amendment, the confession was sufficiently attenuated to make it admissible. See Brief of Commonwealth at 6. The Court disagrees. "The Supreme Court has rejected a per se rule that *Miranda* warnings dissipate the taint of an illegal seizure." *Watson*, 19 Va. App. at 665 (citing *Brown v. Illinois*, 422 U.S. 590, 603, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975)). Instead, the Supreme Court stated in Brown that subsequent *Miranda* warnings were only a factor in the overall analysis, including other factors such as (1) the time elapsing between illegality and the confession, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04. In considering such factors, the Court of Appeals has consistently stated that evidence which is "directly linked to the primary taint of the illegal seizure" is inadmissible against the person who was illegally seized. *Deer v. Commonwealth*, 17 Va. App. 730, 737, 441 S.E.2d 33 (1994).

In *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), the Supreme Court found that a confession subsequent to an illegal seizure was nonetheless admissible because the statement had "become so attenuated as to dissipate the taint" where the defendant had been "released on his own recognizance after a lawful arraignment and had returned voluntarily several days later to make the statement." 371 U.S. at 491. Conversely in *Brown v. Illinois*, the defendant was unlawfully arrested during the investigation of a crime. More than two hours later, Brown was informed of the evidence against him, was given his *Miranda* warnings, and then confessed. More than four hours after that, Brown recorded a second confession after again being advised of his *Miranda* rights. 422 U.S. at 603-

05. Nonetheless, the Supreme Court found that although the confessions were voluntary and therefore valid, they were not of sufficient free will to purge the taint of the unlawful arrest. *Id.*, at 604-05.

Virginia appellate courts have consistently applied the same standards of review. In *Watson*, discussed above, the Court of Appeals found that even though Watson had confessed at the apartment after being given his *Miranda* warnings, and again at the city jail after being given *Miranda* warnings again, "those statements [were] the proverbial 'fruit of the poisonous tree'." *Watson*, 19 Va. App. at 666. Therefore, the "illegal seizure and all the evidence that was obtained as a result 'flowed one from the other with no discernable break in the chain of causation'." *Id.* (quoting *Deer*, 17 Va. App. at 737). Conversely, in *Reese v. Commonwealth*, 220 Va. 1035, 265 S.E.2d 746 (1980), the Virginia Supreme Court held that when there were two searches, a morning search that violated the Fourth Amendment, and an afternoon search that was valid, the confession, based solely on the evidence obtained in the valid afternoon search, was admissible and not tainted by the unconstitutional search. The Virginia Supreme Court found the afternoon search, which was completely unrelated and independent of the morning search, was an "intervening circumstance … [and] thus no causal connection" existed. *Id.*, at 1040.

Here, the facts are much closer to *Brown* and *Watson*, than to *Wong Sun* and *Reese*. The confession occurred on the same evening and during the same course of events as the initial seizure. Accardi never left the police station and returned voluntarily, as in *Wong Sun*. If there had been a seizure in this case, these facts do not reflect a break in the causal chain, even though the police conduct was not "flagrant," and Accardi was treated in a "friendly" manner at the Police Station in Arlington. How the Defendant was treated and whether he was given food and drink and allowed to smoke are indicative as to whether the confession was voluntary and given under free will in terms of the Fifth Amendment, and the analysis here must focus on the Fourth Amendment.

Because the Court concludes that there was no violation of the Fourth Amendment and, therefore, will not suppress the confession on those grounds, the Court must address Accardi's Fifth Amendment argument as well. Accardi asserts that the Arlington Police did not make him sufficiently aware of his Fifth Amendment rights, and, therefore, the confession must be suppressed. After reviewing the relevant case law and testimony from the suppression hearing, the Court finds this assertion to be without merit.

For a confession to be admissible, the Commonwealth bears the burden of proving, by a preponderance of the evidence, that the defendant voluntarily made a knowing and intelligent waiver of his constitutional privilege against

self-incrimination and his right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 475, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966); *Shell v. Commonwealth*, 11 Va. App. 247, 250, 397 S.E.2d 673 (1990). Accordingly, "the Commonwealth first must show that the police complied with the necessary procedural safeguards by advising the defendant of his *Miranda* rights." *Shell*, 11 Va. App. at 251; see also *Blain v. Commonwealth*, 7 Va. App. 10, 13, 371 S.E.2d 838 (1988) (recognizing that "failure to give *Miranda* warnings prior to a custodial interrogation requires suppression of any illegally obtained statements"). Therefore, this inquiry presents three distinct questions: (1) whether the defendant was adequately informed of his constitutional rights so that he could validly effectuate a waiver; (2) whether the confession was voluntary; and (3) whether the confession was knowing and intelligent.

Here, the Arlington Police adequately informed Accardi of his *Miranda* rights. There are no magic words a suspect must utter in order to effectuate a waiver of his *Miranda* rights. *Burket v. Angelone*, 208 F.3d 172, 199 (4th Cir. 2000) (citing *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996)). Rather, "the question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived his rights delineated in the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 373, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979). Despite Detective Meincke's minimization of the importance of the *Miranda* warning, his failure to elicit from the defendant an affirmative acknowledgment that he knew his rights, and despite the defendant's misplaced signature on the *Miranda* waiver form, it is clear from the evidence that the defendant was aware of his *Miranda* rights and chose to talk with the detectives. The evidence establishes that the detectives read Accardi his *Miranda* warning line by line and that Accardi chose to sign the form affirming the fact that he had been read his *Miranda* rights. This conduct serves as an express waiver. Moreover, even though Accardi never stated "I waive my *Miranda* rights," his decision to continue talking with the detectives after being informed of his rights serves as an implied waiver as well. See *Colorado v. Spring*, 479 U.S. 564, 574, 93 L. Ed. 2d 954, 107 S. Ct. 851 (1979) (concluding that the fact that defendant was read his *Miranda* rights, indicated he understood those rights by signing the waiver and was not physically or mentally coerced weighed heavily in favor of finding the defendant waived his Fifth Amendment rights). As the Court of Appeals for the Fourth Circuit explained, "a defendant's subsequent willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver." *Frankson*, 83 F.3d at 82.

The Court also finds that the confession was voluntarily given. In determining whether the confession was voluntary, a court must decide whether "the statement is the product of an essentially free and unconstrained

choice by its maker, or whether the maker's will has been overborne and his capacity for self-determination critically impaired." *Roberts v. Commonwealth*, 18 Va. App. 554, 557, 445 S.E.2d 709 (1994). Here, Accardi offers no evidence to establish that this confession was not of a voluntary nature. Accardi was not pressured or threatened or coerced in any way whatsoever. Rather, he voluntarily chose to speak with the detectives and, eventually, admit to the crime. Thus, this confession was "an essentially free and unconstrained choice by its maker." *Id.*

Finally, the Court finds that the confession was also given knowingly and intelligently. In examining whether the confession was knowing and intelligent, the court must look at the totality of the circumstances, including the background, experience, and conduct of the defendant. *Fare v. Michael C.*, 442 U.S. 707, 717, 61 L. Ed. 2d 197, 99 S. Ct. 2560 (1979); *Burket*, 208 F.3d at 199. In examining the evidence, Accardi was aware that he was confessing to the crime. He understood the gravity of the situation and comprehended the nature of his voluntary decision. Accardi was neither tricked nor coerced, and never expressed a desire to end the interview or leave the Police Station. Accordingly, the Court finds that the confession was both knowing and intelligent.

In sum, Accardi was adequately apprised of his *Miranda* rights and effectuated both a valid express waiver of those rights by signing the waiver form and a valid implied waiver by continuing to speak with the detectives after being apprised of his right not to. Additionally, Accardi's confession was given voluntarily, knowingly, and intelligently. Therefore, the confession was not obtained in violation of the Fifth Amendment and cannot be suppressed on those grounds.

### Conclusion

Neither Virginia nor District of Columbia law mandates suppression of the confession. Moreover, the confession was not obtained in violation of either the Fourth Amendment or the Fifth Amendment. Therefore, the Court must deny the motion to suppress the confession.